

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-015-CV

| | |
|---|---|
| SHELLEY DURRELL HAINES CRITZ AND ROGER ALLEN CRITZ | APPELLANT/ CROSS-APPELLANT |

V.

| | |
|---|---|
| ROGER ALLEN CRITZ, JOSEPH C. CRITZ, AND SHARON A. CRITZ AND SHELLEY DURRELL HAINES CRITZ | APPELLEES/ CROSS-APPELLEE |

------------

## FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

Appellant Shelley Durrell Haines Critz complains of the trial court's final decree of divorce appointing appellees Joseph C. Critz and Sharon A. Critz as joint managing conservators of Ryder Critz. We reverse and remand.

## I. Background

Roger and Shelley Critz met while they were both working at a nightclub in the early 1990s. In February 1998, Shelley gave birth to their only child, Ryder, and in September of that year, Shelley and Roger married.

In February 2003, after an argument about Roger's alleged drug use, Roger moved out of their house. Shelley remained in the house with Ryder for another six months before she learned that it was being foreclosed.

Both Shelley and Ryder eventually moved in with Roger's parents, Joseph and Sharon Critz (the Grandparents). While Shelley and Ryder were living with the Grandparents, Shelley met and began dating Chris Martinez. In January of 2004, she began staying with Chris and away from the Grandparents' house on weekends. In May 2004, Shelley became pregnant with Chris's child.

In June 2004, Shelley moved in with Chris and his parents while Ryder continued to stay with his Grandparents. During much of the remainder of 2004, Shelley was hospitalized due to complications from her pregnancy. She saw Ryder one day in September, two days in October, no days in November, and three days in December. She also kept in contact with him by phone. During Christmas, she drove to the Grandparents' house to see Ryder but she became sick on the return trip and miscarried.

On January 27, 2005, Roger filed an original petition for divorce requesting that he be appointed primary joint managing conservator of Ryder. The same day, the Grandparents filed a petition intervening into the divorce suit seeking primary joint managing conservatorship on the grounds that Roger and Shelley had voluntarily abandoned Ryder, and that appointing Roger or Shelley as a primary conservator would significantly impair Ryder's physical health or emotional development.

Shelley filed answers to the petitions, along with a counterpetition for divorce requesting that she be appointed sole managing conservator, and contending that appointment of the Grandparents or Roger as joint managing conservators would not be in Ryder's best interests.

On May 12, 2005, the trial court issued temporary orders that gave the Grandparents primary custody of Ryder, and delineated specific times when Shelley and Roger had rights to possession.

In November 2006, Todd Maslow, a caseworker for Family Court Services, submitted a social study report recommending that Ryder should continue to reside with the Grandparents, but that he should continue to see Shelley as much as possible.

In March 2007, the Grandparents filed a "parenting plan" for Ryder, which intended to "establish guidelines," "state the importance of [Ryder's] well

3

being," and "establish goals for emotional support, education, and discipline." The parenting plan described their intentions for Ryder's education (including plans related to his ADHD),[1] his after-school care, his medical needs (including a list of health care providers he would use), and Roger's and Shelley's proposed roles. The plan proposed that they, Shelley, and Roger all be appointed as joint managing conservators, that the Grandparents should establish his primary residence, and that Shelley and Roger should have designated times of possession, including times during the summer and on holidays.

The issues regarding Ryder's custody were tried before the trial court in March 2007. After the parties rested and counsel made closing arguments, on March 30, 2007, the trial court appointed the Grandparents, Shelley, and Roger as joint managing conservators of Ryder, with the Grandparents having primary possession and the authority to establish his permanent residence. The trial court set particular dates and times for Shelley to have access to Ryder, but stated that Roger would have such access only "at such times as is agreed

---

[1] Ryder was diagnosed with ADHD while in the second grade.

4

upon" between him and his parents.  In October 2007, the trial judge signed a final decree of divorce that incorporated these decisions.[2]

In November 2007, Shelley filed a motion for new trial, asserting that the evidence presented at trial was legally and factually insufficient to support the trial court's conservatorship decision, and she requested the court to issue findings of fact and conclusions of law related to its decree.[3]  The Grandparents responded to the motion for new trial and submitted proposed findings of fact and conclusions of law, which the trial court adopted.  In the court's findings of fact, the court found that the Grandparents "rebutted the parental presumption" and that it was in Ryder's best interest that the Grandparents, Shelley, and Roger be appointed joint managing conservators.  This appeal and cross-appeal followed.

## II.    Issues on Appeal

Shelley complains of the trial court's order appointing the Grandparents as joint managing conservators of Ryder.  She contends that the trial court erred in failing to make specific findings of fact identifying the basis for its

---

[2] ... Specifically, the decree granted Shelley possession of Ryder on three weekends per month, Thursday evenings, spring breaks, some of the time during Ryder's Christmas break, Mother's Day, some other holidays, and forty-two days during the summer, but gave possession to the Grandparents at "all other times not specifically designated."

[3] ... *See* Tex. R. Civ. P. 296.

5

conclusion that the parental presumption was rebutted by the Grandparents. She further contends that the evidence is legally and factually insufficient to prove that she relinquished control of Ryder for more than one year and that she would significantly impair Ryder's physical or emotional well-being. Roger complains of the trial court's failure to specify his periods of possession and access.

## A.    Standard of Review

A trial court's decision regarding the conservatorship of a child is reviewed under an abuse of discretion standard.[4] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[5] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[6]

---

[4] *See In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.); *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

[5] *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

[6] *Id.*

An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence.[7] Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[8]

B.      The Parental Presumption

In her first issue, Shelley contends that the trial court abused its discretion when it appointed the Grandparents as joint managing conservators of Ryder without making specific findings related to the parental presumption described by sections 153.131 and 153.373 of the family code.[9]   Section 153.131 provides:

> (a)     Subject to the prohibition in Section 153.004,[10] unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional

[7] ... *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).

[8] ... *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

[9] ... Tex. Fam. Code Ann. §§ 153.131, .373 (Vernon 2008).

[10] ... Section 153.004 states, in part, that in determining conservatorship, a court shall consider evidence of the intentional use of abusive physical force and that a court may not "appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child . . . that results in the other parent becoming pregnant with the child."  Tex. Fam. Code Ann. § 153.004(a)–(b) (Vernon 2008); *see In re R.T.H.*, 175 S.W.3d 519, 521 (Tex. App.—Fort Worth 2005, no pet.).

development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

(b)  It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child.  A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.[11]

Section 153.373 states that

[t]he presumption that a parent should be appointed or retained as managing conservator of the child is rebutted if the court finds that:

(1)  the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent, licensed child-placing agency, or authorized agency for a period of one year or more, a portion of which was within 90 days preceding the date of intervention in or filing of the suit; and

(2)  the appointment of the nonparent or agency as managing conservator is in the best interest of the child.[12]

Collectively, these statutes provide that it is presumed that the appointment of "the parents of a child" as joint managing conservators is in the best interest of the child.[13]  To overcome this presumption, a court must find

---

[11] Tex. Fam. Code Ann. § 153.131.

[12] *Id.* § 153.373.

[13] *Id.* §§ 153.131(a),(b), .373.

that (1) appointment of the parents would significantly impair the child's physical health or emotional development, (2) the parents have exhibited a history of family violence, or (3) the parents voluntarily relinquished care, control, and possession of the child to a non-parent for a year or more.[14] A trial court's conclusion that the parental presumption has been rebutted must be supported by specific findings of fact identifying the factual basis for the finding, and the failure to make such findings constitutes error.[15]

Shelley contends that the trial court was required to specifically make one of these three findings to appoint the Grandparents as joint managing conservators. Relying on a Texas Supreme Court opinion construing a former version of the family code, the Grandparents assert that the presumption does not apply and, therefore, no findings were required because Shelley and Roger were also made joint managing conservators.

In *Brook v. Brook*,[16] the supreme court construed former family code section 14.01, which provided, in pertinent part, as follows:

---

[14] *Id.* §§ 153.131(a),(b), .373; *see In re N.J.G.*, 980 S.W.2d 764, 766 n.1 (Tex. App.—San Antonio 1998, no pet.).

[15] *Chavez v. Chavez*, 148 S.W.3d 449, 459–60 (Tex. App.—El Paso 2004, no pet.); *see* Tex. Fam. Code Ann. §§ 153.004, .131, .373.

[16] 881 S.W.2d 297 (Tex. 1994).

(a)   In any suit affecting the parent-child relationship, the court may appoint a sole managing conservator or may appoint joint managing conservators.   A managing conservator must be a suitable, competent adult, or a parent, or an authorized agency.  If the court finds that the parents are or will be separated, the court shall appoint at least one managing conservator.

(b)   A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:

> (1)   the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.[17]

The supreme court held that section 14.01 authorized a trial court to appoint a non-parent as a joint managing conservator without proof that appointment of a parent or the parents would significantly impair the child's health or development, so long as the non-parent shares custody with a parent.[18]

Unlike current section 153.131, former section 14.01 contained no rebuttable presumption that appointment of both parents as joint managing

---

[17] ... Act of May 29, 1993, 73rd Leg., R.S., ch. 766, § 1, sec. 14.01(a), 1993 Tex. Gen. Laws 2989, 2989, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; Act of May 28, 1989, 71st Leg., R.S., ch. 370, § 1, sec. 14.01(b)(1), 1989 Tex. Gen. Laws 1461, 1461, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282.

[18] ... *Brook*, 881 S.W.2d at 300.

conservators is in the child's best interest.[19] At the time *Brook* was decided, a trial court was authorized to appoint parents as joint managing conservators only upon finding that the appointment would be in the child's best interest.[20] This is no longer the law.[21]

Under current section 153.131, it is now presumed that the appointment of *both* parents as joint managing conservators is in the child's best interest.[22] This substantive change in the parental presumption law is not addressed by the dissent. When *Brook* was decided, there was no rebuttable presumption that *both* parents be appointed joint managing conservators. Thus, under

---

[19] *See* Tex. Fam. Code Ann. § 153.131(b), Historical and Statutory Notes ("Acts 1995, 74th Leg., ch. 751 . . . added subsec. (b)," which provides for "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child").

[20] *See* Act of May 14, 1991, 72nd Leg., R.S., ch. 161, § 2, 1991 Tex. Gen. Laws 771, 771, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; *see also Brook*, 881 S.W.2d at 298.

[21] While we have found no legislative history beyond the changes made to the current statute after section 14.01 was repealed that expressly indicates that the legislature intended to overrule or nullify *Brook* when it repealed section 14.01, it is clear from a comparison of the two statutes that the post-*Brook* changes to the statutes were substantive.

[22] *See* Tex. Fam. Code Ann. § 153.131(a) ("*both parents* shall be appointed as joint managing conservators of the child") (emphasis added), § 153.131(b) ("It is a rebuttable presumption that the appointment of *the parents* of a child as joint managing conservators is in the best interest of the child.") (emphasis added).

former law, so long as one parent was appointed a joint managing conservator, as was the case in *Brook*, the parental presumption was satisfied. Under section 153.131, however, a non-parent may not be appointed a joint managing conservator without overcoming the presumption as to *both* parents.[23] The plain wording of the statute makes clear that this presumption applies when a non-parent seeks managing conservatorship in lieu of or in addition to both parents. There is no language in section 153.131 that indicates that the presumption is inapplicable to the appointment of non-parents as joint managing conservators when the trial court also appoints one or both parents. Nor does *Brook* compel this result.

The dissent suggests that we have departed from binding precedent of the supreme court and of this court. We clearly have not. *Brook*, and this court's nearly twenty-year-old decision following it,[24] interpreted and applied a

---

[23] *See* Tex. Fam. Code Ann. § 153.131(a) ("*both parents* shall be appointed as joint managing conservators of the child") (emphasis added), § 153.131(b) ("It is a rebuttable presumption that the appointment of *the parents* of a child as joint managing conservators is in the best interest of the child.") (emphasis added). The dissent contends that the presumption does not apply to the grandparents because both parents were appointed as joint managing conservators. But section 153.131 clearly requires that the presumption favoring the appointment of both parents as joint managing conservators be rebutted by any non-parent seeking a joint managing conservatorship appointment in lieu of or in addition to both parents.

[24] *See Connors v. Connors*, 796 S.W.2d 233, 239 (Tex. App.—Fort Worth 1990, writ denied).

former statute that did not contain a parental presumption requiring that both parents be appointed joint managing conservators unless rebutted. Because *Brook* construed a repealed statute that is substantively different than the statute at issue here, we are, of course, not bound under the doctrine of stare decisis by the *Brook* court's interpretation of the repealed statute.[25]

The dissent takes the novel position that the presumption does not apply to the appointment of the joint managing conservators in this case, but that it does apply to which joint managing conservator should determine the child's permanent residence. As written by the legislature, however, section 153.131 contains no language that indicates a legislative intent that a parental presumption applies to the issue of primary custody *apart from* the determination of joint managing conservatorship. The title to section 153.131 is "Presumption That Parent to be Appointed *Managing Conservator*."[26] Moreover, the statute expressly refers to a presumption that a parent should be appointed "sole managing conservator," or that both parents should be appointed "joint managing conservators"—it makes no reference to a separate

---

[25] *See Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 473–74 (Tex. App.—Fort Worth 2007, no pet.) (rejecting argument that statute that was substantively amended should be construed as if it had not been amended).

[26] Tex. Fam. Code Ann. § 153.131 (emphasis added).

13

presumption for determining which joint managing conservator chooses the child's permanent residence.[27] To reach the result that the dissent advocates, we would be required to legislate from the bench and convert the managing conservator presumption into a "primary custody" presumption with no statutory authority for doing so. We are not inclined to do this.[28]

We hold that the trial court correctly followed express provisions of the family code by applying the parental presumption to the appointment of the Grandparents as joint managing conservators in this case. Upon finding that the parental presumption was rebutted, however, the trial court failed to make findings specifically stating how the presumption was rebutted.[29] The failure to make such findings is error.[30] This error was waived, however, because

---

[27] ... *Id.*

[28] ... Moreover, the two El Paso Court of Appeals opinions on which the dissent relies actually support the conclusion that the parental presumption only applies to primary custody in the context of determining joint managing conservatorship between a parent and non-parent. *See Sotelo v. Gonzales*, 170 S.W.3d 783, 788 (Tex. App.—El Paso 2005, no pet.); *In re De La Pena*, 999 S.W.2d 521, 534–35 (Tex. App.—El Paso 1999, no pet.).

[29] ... The trial court also offered no explanation for why he appointed Shelley and Roger joint managing conservators of Ryder after concluding that the presumption was rebutted, i.e., that it would not be in Ryder's best interest to appoint his parents as joint managing conservators.

[30] ... *Chavez*, 148 S.W.3d at 459–60.

Shelley did not timely request additional findings of fact.[31] Shelley's first issue is overruled.

C.    The Sufficiency of the Evidence to Overcome the Parental Presumption

We now turn to Shelley's contention in her second issue that insufficient evidence was presented by the Grandparents to rebut the presumption through either voluntary relinquishment or significant impairment grounds.[32]

1.    Standards of Review

In an abuse of discretion review, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant factors in assessing whether a trial court abused its discretion.[33] Thus, in applying the abuse of discretion standard, an appellate court in a family law case must apply a two-prong analysis: (1) whether the trial court had sufficient evidence upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion.[34]

---

[31]... Tex. R. Civ. P. 297, 299; *Chavez*, 148 S.W.3d at 459–60.

[32]... Joseph and Sharon have not contended on appeal that the evidence supported a finding that Shelley exhibited a history of family violence, so we will not analyze this ground for rebutting the parental presumption. *See* Tex. Fam. Code Ann. § 153.131(b).

[33]... *M.P.B.*, 257 S.W.3d at 811–12; *In re M.C.F.*, 121 S.W.3d 891, 895, 899 (Tex. App.—Fort Worth 2003, no pet.).

[34]... *M.C.F.*, 121 S.W.3d at 895.

15

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.[35] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[36]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary

---

[35] ... *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[36] ... *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[37]

2.    Voluntary Relinquishment of Ryder for a Period of One Year or More

The Grandparents contend that Shelley's sparse contact with Ryder from January 2004 to January 2005 proves that she voluntarily relinquished actual care, control, and possession of Ryder to them.  We disagree.

Between January and April of 2004, Shelley maintained her permanent residence with Ryder and saw him on a majority of days.  While she was absent from Ryder on several occasions during that time period, there is no evidence that she intended to surrender the care of Ryder.

After Shelley moved out of the Grandparents' residence in June 2004, the time she spent with Ryder decreased.[38]  But, the testimony of both Shelley and Sharon shows that, although Shelley was often physically separated from Ryder in the latter part of 2004, she did not intend to relinquish control of him.

Shelley testified that she had agreed with the Grandparents that Ryder would stay with them long enough to complete his school year, and that she

---

[37] *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

[38] According to Sharon's calendar, Shelley saw Ryder only twenty times from June through December 2004.

would change Ryder's school and have him live with her the following year. Shelley stated that she talked with the Grandparents about this plan "[w]eekly from the moment that [she] didn't stay at their house" and that she was "made to believe" that the change was going to happen. Sharon testified that she was aware of these plans when Shelley moved out of her house, and that she knew that Shelley's intention was to take Ryder back. She also admitted that even when Shelley moved away, she was "still involved in decisions regarding Ryder" and, most importantly, that Shelley "never actually, really relinquished . . . control completely."

Thus, while Shelley may have been physically apart from Ryder for a substantial part of 2004, there is no evidence that she voluntarily relinquished actual care, custody, and control of him to the Grandparents.[39]

---

[39] Even if we were to conclude that some evidence of relinquishment existed beginning in June 2004, when Shelley moved out of the Grandparents' home, she filed answers to Roger's petition and the Grandparent's petition in intervention in February 2005 and, therefore, ended any period of voluntary relinquishment approximately seven months after leaving the Grandparents' house to leave Ryder with his grandparents. *See In re S.W.H.*, 72 S.W.3d 772, 777 (Tex. App.—Fort Worth 2002, no pet.). Moreover, in May 2005, the trial court entered a temporary order restricting Shelley's access to Ryder. In light of such an order, any relinquishment by Shelley that occurred while the order was in effect was involuntary. *Id.* (concluding that a temporary restraining order entered against a parent ended the parent's period of voluntary relinquishment); *see also In re M.W.*, 959 S.W.2d 661, 668 (Tex. App.—Tyler 1997, writ denied) (suggesting that voluntary relinquishment ends when temporary restrictions are ordered).

3.  Significant Impairment of Ryder's Physical Health or Emotional Development

Shelley also contends that the evidence is legally and factually insufficient to establish that appointing her and Roger as joint managing conservators would significantly impair Ryder's physical health or emotional development.[40] Although there is some evidence to support a finding of significant impairment, we agree with Shelley that the evidence is factually insufficient to support such a finding.

Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent, will probably cause that harm.[41] This is a heavy burden that is not satisfied by merely showing that the non-

---

[40] *See* Tex. Fam. Code Ann. § 153.131(a); *Sotelo*, 170 S.W.3d at 788.

[41] *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (stating that the "link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation"); *see* Tex. Fam. Code Ann. § 105.005 (Vernon 2008) (stating that findings in family law cases must generally be proved by the preponderance standard).

parent would be a better custodian of the child.[42]  "Close calls" should be decided in favor of the parent.[43]

Evidence of past misconduct is not alone sufficient to show present unfitness.[44]  "If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."[45]

The evidence offered at trial was as follows:

Diane Booth, a licensed social worker who conducted another study in 2006 after Maslow issued his report, testified that Joseph and Sharon were "great grandparents" and that Shelley was a good mom who never put Ryder in any danger and was generally doing a good job parenting him.  She also reported that Roger had drug addiction problems, that he described himself as a "practicing alcoholic," and that he seemed to be angry over the fact that he had been adopted, but that he had steady work and that he "loved being

---

[42]... *Lewelling*, 796 S.W.2d at 167.

[43]... *Id.* at 168.

[44]... *Id.*

[45]... *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (op. on reh'g); *see S.W.H.*, 72 S.W.3d at 777–78 (holding that the mother's past severe drug addiction and past incarcerations related to drug use did not create a present likelihood of significant impairment to her child).

around Ryder." She further explained that when she met with Ryder, he was happy, but he was also confused about his living situation regarding the various people who had requested custody of him. She also testified that she received a letter from Ryder stating that he wanted to live with Shelley.

Booth recommended that Ryder be placed with Shelley and opined that it would be in Ryder's best interest if the Grandparents fulfilled a secondary role in a more typical grandparent relationship with Ryder.

Barbara Martinez, Chris's mother, testified that Shelley was a good mother who took good care of Ryder when he was at her house. According to Mrs. Martinez, Shelley bathed Ryder, did his laundry, disciplined him, and helped him with his homework. Kyra Anderson, Ryder's first grade teacher during 2004 and 2005, testified that the Grandparents were very involved in his school activities and in the progress Ryder was making in the classroom, that Ryder "fully enjoyed being with" them, and that Shelley was not involved with his schooling.[46]

Dee Henderson, who had custody of Shelley's daughter Lexi, testified that she had concerns about Shelley's ability as a parent because Shelley was

---

[46] At trial, Shelley testified that she visited Ryder's school two days a week and that she went to his school-related activities.

unreliable and had only limited contact with Lexi.[47] She also testified, however, that she had no concerns that Lexi would be physically harmed while with Shelley, that she had no concerns about Lexi's safety at the Martinezes' house, and that she had never seen Shelley be physically or verbally abusive to Lexi or Ryder.

Cathy Baczynski, a licensed professional counselor, testified that, during counseling, Roger discussed identity issues related to his adoption as well as his substance abuse history, his need to overcome his ADHD, his frustration about living with his parents, and his lack of communication with Shelley. Baczynski also explained that she met with Ryder and gained the impression from him that Roger needed to be much more involved in Ryder's life. She also stated that Ryder seemed to be happy living with his Grandparents and that his needs were well met in their home, but that he would like to spend more time with Shelley and that, as a general rule, it is always best for a child's parents to have custody if possible. She concluded that Roger has made positive strides, but he does not have the ability to be Ryder's primary managing conservator.

---

[47]... Shelley has had six pregnancies. Among these, she had a daughter in 1994 named Lexi whom she lived with for only six months and shared access to at the time of trial, and she also had a baby with Chris after her miscarriage, who was six months old when the trial began.

Roger testified that he resided with his parents for three years preceding the trial, that he was currently employed in the information technology field, and that he had previously been employed as a bartender at several locations. He stated that two years had passed from the last time he used illegal drugs and that he drank alcohol about once a week at the time of trial, becoming drunk occasionally. He expressed a desire to be a good father and also gave his opinion that Ryder should continue to reside with the Grandparents because he felt Ryder needed more "structure and support," but that Shelley should have equal time with Ryder and that she "loves [Ryder] very much." However, Roger also testified that in January 2005 Shelley threatened to take Ryder away so that he and the Grandparents would never see Ryder again.[48] He further said that when he first separated from Shelley he was concerned for Ryder's safety because he believed Shelley did not take care of Ryder's physical needs.

Sharon testified that she and Joseph first began to keep Ryder at their home every other weekend when he was born, and then they progressed to keeping him every weekend and part of the summer before Shelley and Ryder moved in with them in 2003. She also contended that Shelley was not very

---

[48] Sharon's testimony confirmed the threat.

23

involved in Ryder's early education and that she often returned Ryder late from her Wednesday visits with him. Sharon explained that upon picking up Ryder from one of his visits to the Martinezes' house, she became concerned about broken glass surrounding a trampoline, a murky swimming pool, and an open flame on the stove, which Shelley stated was used for heating. She was also concerned that Shelley had taken Ryder to the nightclub during a poker tournament that was hosted there.

Sharon said that she saw Shelley slap Ryder one time, that Shelley told her that she spanks Ryder, and that after returning from visits with Shelley, Ryder had behavioral problems. She conceded, however, that Ryder missed Shelley and that he and Shelley loved each other. She requested that the court allow her and Joseph to keep Ryder during school weeks and split the rest of Ryder's access equally between Roger and Shelley.

Joseph testified that he was concerned that Shelley could not provide a stable financial environment for Ryder because she did not have a paying job, did not have a car in her name, and did not have her own place to live. Joseph described that Roger had taken a more active role in Ryder's life, had obtained a respectable job, had provided health insurance for Ryder, and had sought help from a therapist to deal with Roger's emotional problems.

24

Todd Maslow (who submitted the original social study report) testified that, despite his recommendation that Ryder should remain with his Grandparents, he would not have concerns about Ryder's safety if he stayed with Shelley and did not believe that Ryder living with Shelley would significantly impair Ryder's physical health or emotional development.[49] He also testified that when he talked to Ryder when completing his initial study, Ryder told him he wanted to live with Shelley.

The Grandparents also rely on evidence of Shelley's history of drug use and her living and financial conditions as proof that Ryder's physical and emotional health would be impaired by the appointment of Shelley and Roger as joint managing conservators. At the time of trial, however, Shelley was not taking any medications. While she admitted that she had previously been dependent on drugs prescribed for her multiple sclerosis,[50] and evidence

---

[49] ... Specifically, Maslow stated that the move to live with Shelley "could affect [Ryder's] emotional adjustment; but seriously impair, no." He did, however, testify that he believed the Grandparents and Roger were providing Ryder with security in his current placement, that Ryder should remain with them, and that he retained some concerns about some of Shelley's circumstances and her truthfulness on some of the responses she gave to him in his initial survey.

[50] ... Shelley had taken many prescription medications, including Suboxone, Seroquel, Hydrocodone, Ambien, Lunesta, Lamictal, and Xanax at various times before trial. These medications sometimes made her dizzy or drowsy with slurred speech. Sharon testified that in 2003, Shelley often left medication out in places that Ryder had access to, and that in 2005, during one

25

established that she had taken high dosages of several types of prescription medications that sometimes negatively affected her,[51] she testified that at the time of trial, she was not taking any prescription medications, she had no current symptoms from her multiple sclerosis, and she only had one prescription—for Xanax—filled within the previous six months.  No evidence was presented indicating that Shelley was still taking high dosages of prescription medications at the time of or recently before trial; in fact, a "prescription profile" exhibit submitted into evidence by the Grandparents listed no prescriptions for Shelley after 2005.  Thus, while Shelley's drug use may have affected her fitness as a mother in the past, there was no evidence presented of any current drug use that would cause significant impairment to Ryder's physical health or emotional development in the present.

With regard to Shelley's living and financial conditions, the evidence shows that, at the time of trial, Shelley and Chris, who also has a history of drug abuse, were living together at his parents' home.  Chris, however, offered

---

of Shelley's scheduled visits with Ryder, the medication caused Shelley to sleep for a prolonged period on Ryder's bedroom floor.

[51] ... A pharmacist called by Roger's attorney described the medications Shelley had taken and opined that the dosages were high, but admitted that she had limited knowledge of multiple sclerosis and the reasons why Shelley's doctors may have been prescribing the types and amounts of medication she was taking.

uncontroverted testimony that he had not used illegal drugs in at least the four years preceding trial. Also, the evidence established that at the Martinezes' five bedroom, two story house, Ryder had his own room and that Shelley's work at the nightclub on weekends could allow her to be a stay-at-home mom for Ryder during weekdays.[52] Shelley's residence at the Martinezes' house seemed to be stable. Mrs. Martinez testified that Shelley had become like a daughter to her and that if Chris's and her relationship became estranged, Shelley could continue to live at her house with Ryder. Although, as the Grandparents point out, Shelley does not own or lease a vehicle, carry health insurance, or maintain paid employment, Mrs. Martinez testified that Shelley has access to four vehicles at her house and that she is "free to take them anytime," Roger carries insurance for Ryder, and Shelley's lack of paid employment is "no evidence" of a potential for significant impairment to Ryder.[53]

Finally, the Grandparents cite evidence in the record related to certain conditions at the Martinezes' house that they believe could cause harm to Ryder. For example, they note that the Martinezes' backyard had a murky pool that was filled with leaves and a trampoline that had broken glass

---

[52] ... Shelley helped manage a nightclub that she, Chris, and Chris's parents jointly owned, although she received room and board in lieu of salary. Chris's mother watched Ryder when Shelley worked.

[53] ... *See Lewelling*, 796 S.W.2d at 167.

underneath it. Mrs. Martinez, on the other hand, testified that Ryder was never allowed unattended outside, that an alarm sounded if any door in the house was opened, and that if the trial judge was concerned about the safety of the pool, she would remedy those concerns. Sharon testified that she had learned that the broken glass was from a patio table that had blown into the pool during a windstorm; there was no evidence in the record as to how recently the windstorm had occurred. Sharon was also concerned at trial about an open flame used to heat the Martinezes' house, but she admitted that Ryder had been taught about fire hazards and that he was unlikely to attempt to play with the flame.

Viewing the entire record under the legal and factual sufficiency standards of review articulated above, we conclude that, while there is some evidence that placing Ryder under the joint managing conservatorship of Shelley and Roger might significantly impair the physical health and emotional development of Ryder, the evidence is factually insufficient to support a finding of such impairment.

III. Conclusion

We hold that the trial court abused its discretion by appointing the Grandparents as joint managing conservators because the evidence is insufficient to support the trial court's finding that the parental presumption

28

was rebutted. There is no evidence that Shelley voluntarily relinquished actual care, custody, and control of Ryder for one year or more, and the evidence is factually insufficient to prove that the appointment of Ryder's parents as joint managing conservators would significantly impair Ryder's physical health or emotional development. We, therefore, reverse the provisions of the decree pertaining to joint managing conservatorship, render judgment that a non-parent shall not be appointed joint managing conservator based on Shelley's alleged voluntary relinquishment of Ryder's care, custody, and control for the period between January 2004 and January 2005, and remand the case for a new trial on the issue of whether the appointment of Shelley and Roger as joint managing conservators would not be in the best interest of Ryder because such an appointment would significantly impair his physical health or emotional development.[54]

JOHN CAYCE
CHIEF JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

LIVINGSTON, J. filed a dissenting and concurring opinion.

---

[54] Because we have reversed and remanded the issues related to conservatorship and possession, we need not address Roger's sole issue in which he contends that the trial court abused its discretion by rendering a custody order that, although naming him a joint managing conservator of Ryder, did not designate his periods of possession and access. *See* Tex. R. App. P. 47.1.

29

DELIVERED:  September 17, 2009



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-015-CV

SHELLEY DURRELL HAINES CRITZ
AND ROGER ALLEN CRITZ

APPELLANT/
CROSS-APPELLANT

V.

ROGER ALLEN CRITZ, JOSEPH
C. CRITZ, AND SHARON A.
CRITZ AND SHELLEY DURRELL
HAINES CRITZ

APPELLEES/
CROSS-APPELLEE

------------

FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY

------------

## DISSENTING AND CONCURRING OPINION

------------

The majority holds that the trial court could not appoint Joseph and Sharon (the Grandparents) together with Shelley and Roger (the Parents) as Ryder's joint managing conservators without applying the statutory parental presumption and determining that the Parents voluntarily relinquished care, custody, or control of Ryder or that the Parents' appointment as managing

conservators would significantly impair Ryder's physical health or emotional development.  *See* Majority op. at 9–14.  The majority departs from Texas Supreme Court precedent and our own precedent in its holding.

The Collective Appointment of the Grandparents and the Parents as Ryder's Joint Managing Conservators

Shelley's argument in her second issue that the trial court abused its discretion when it appointed the Grandparents as Ryder's joint managing conservators along with the Parents in that same role presupposes that the Grandparents were required to overcome the statutory parental presumption to gain the appointment.  That supposition (and the majority's holding that follows the supposition) is erroneous.

Sections 153.131 and 153.373 of the family code establish that to overcome the presumption that a parent must be appointed as a managing conservator of a child, a court must find that (1) appointment of the parent would significantly impair the child's physical health or emotional development, (2) the parent has exhibited a history of family violence, or (3) the parent voluntarily relinquished care, control, and possession of the child to a nonparent for a year or more.  Tex. Fam. Code Ann. §§ 153.131, .373 (Vernon 2008); *see In re N.J.G.*, 980 S.W.2d 764, 766 n.1 (Tex. App.—San Antonio 1998, no pet.) (citing sections 153.131 and 153.373 in a discussion of the parental

2

presumption). But these findings are not required when both parents are named managing conservators.

Section 153.372 authorizes a trial court to appoint parents and nonparents together as joint managing conservators. Tex. Fam. Code Ann. § 153.372(a) (Vernon 2008). And Texas Supreme Court precedent holds that the mere appointment of grandparents as joint managing conservators alongside parents in that same role does not require a trial court to apply the parental presumption to exclude the grandparents; rather, the trial court may make such an appointment if it deems the appointment to be in the best interest of the child. *Brook v. Brook*, 881 S.W.2d 297, 299–300 (Tex. 1994).

In *Brook*, the court reviewed the collective appointment of the mother and the mother's parents as joint managing conservators to the exclusion of the father and unanimously reasoned that the statutory parental presumption "contemplates a situation in which neither of the parents are awarded" managing conservatorship. *Id.* at 298–99. The court explained that the parental presumption applies "only to those situations in which a nonparent seeks custody *in lieu of* a natural parent." *Id.* at 299 (emphasis added). Finally, the court noted that "[t]he purpose of the statute, to codify the preference for giving custody to a parent, has been met in the present case. The fact that a nonparent shares custody does not detract from the fact that

3

one of the child's parents does have custody." *Id.* at 300. We have expressly held the same. *Connors v. Connors*, 796 S.W.2d 233, 239 (Tex. App.—Fort Worth 1990, writ denied) (holding that the presumption "does not preclude the appointment of a parent to serve jointly with a non-parent" and that it applies only if "appointment is to be denied to both parents").

While *Brook* cited a previous version of the family code, the language analyzed in the decision is almost exactly the same as the language that now appears in subsection (a) of section 153.131.[1] *Brook*, 881 S.W.2d at 298–99.

---

[1] Subsection (a) of section 153.131 currently provides,

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

Tex. Fam. Code Ann. § 153.131(a). At the time of the *Brook* decision, the former section of the family code relating to the presumption stated,

> A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:
>
> 1) the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.

Act of May 28, 1989, 71st Leg., R.S., ch. 370, § 1, sec. 14.01(b)(1), 1989

The only addition to the presumption statute that amounts to anything beyond rearranging words is subsection (b) of section 153.131, which states that it is "a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child."

The majority solely relies on subsection (b) as having precedent-overruling importance. *See* Majority op. at 10–13. But while it is possible (although not supported by any specific authority or legislative history in the majority's opinion beyond the statutory amendment itself) that subsection (b) could have modified *Brook* to the extent that the presumption applies unless both parents (rather than a single parent, like in *Brook*) are named joint managing conservators, that possible modification would have no effect on *Brook*'s relation to this case because here the trial court *did name* both of the Parents as joint managing conservators, and thus completely complied with subsection (b). Thus, for section 153.131(b) to achieve the precedent-altering result that

Tex. Gen. Laws 1461, 1461, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; *see Brook*, 881 S.W.2d at 298. In essence, the legislature amended the family code to switch the order of the words existing in both provisions; it moved the words "the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development" from behind to in front of the words "[a] parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child."

5

the majority holds it does under the facts of this case, it would need to go beyond stating that "[i]t is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child" to say something similar to "it is a rebuttable presumption that the appointment of parents of a child as joint managing conservators *to the exclusion of all other parties seeking custody* is in the best interest of the child." It does not do so.[2]

It is "fundamental to the very structure of our appellate system that [the Texas Supreme Court's] decisions be binding on the lower courts." *Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 666 (Tex. 2008), *cert. denied*, 129 S. Ct. 2767 (2009); *see Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) (explaining that it "is not the function of a court of appeals to abrogate or modify established precedent"). Under the established precedent of the supreme court

---

[2] The majority states, "There is no language in section 153.131 that indicates that the presumption is inapplicable to the appointment of non-parents as joint managing conservators when the trial court also appoints one or both parents." Majority op. at 12. But there was likewise no such language in the version of the statute analyzed in *Brook*. *Brook*, 881 S.W.2d at 298–99. The majority also argues that the *Brook* and *Connors* opinions regarded "a former statute that did not contain a parental presumption requiring that both parents be appointed joint managing conservators unless rebutted." Majority op. at 12–13. But again, that change to the former statute is irrelevant to this case because the trial court *did appoint* both Parents as joint managing conservators.

in *Brook* and of our own court in *Connors*, the Grandparents did not have to overcome the parental presumption for their appointment as joint managing conservators, and I would hold that their appointment as such is in Ryder's best interest under the factors listed in *Holley v. Adams.* 544 S.W.2d 367, 372 (Tex. 1976). Thus, I would affirm the trial court's conservatorship appointment, and I dissent to the portion of the majority's opinion reversing the appointment.

Primary Possession

Although *Brook*'s application supports affirming the Grandparents' appointment as managing conservators along with the Parents, it does not extend to their award of Ryder's primary possession, as challenged by Shelley. Section 153.134(b)(1) of the family code states that in rendering an order appointing joint managing conservators, a court shall designate which conservator has the exclusive right to determine the primary residence of the child. Tex. Fam. Code Ann. § 153.134(b)(1) (Vernon 2008).

In *Sotelo v. Gonzales*, the El Paso Court of Appeals decided that in an original custody determination, the parental presumption "applies when a non-parent and parent are appointed joint managing conservators of a child but the non-parent is given primary custody." 170 S.W.3d 783, 788 (Tex. App.—El Paso 2005, no pet.) (citing *In re De La Pena*, 999 S.W.2d 521, 534–35 (Tex. App.—El Paso 1999, no pet.)). The court reasoned that to "hold

otherwise would permit the court to apply the presumption in appointing the parent a joint managing conservator but nevertheless choose the primary residence of the child on the basis of a heads-up best interest test, with the court determining which of the parties is the 'better' choice." *Id.* This would, according to the El Paso Court, result in the "appointment of a parent as a managing conservator in name only, a paper title which eviscerates the purpose of the statute." *De La Pena*, 999 S.W.2d at 535.

In contrast, the San Antonio Court of Appeals held in *Gardner v. Gardner* that the parental presumption does not apply to the issue of primary possession between parent and nonparent joint managing conservators. 229 S.W.3d 747, 752 (Tex. App.—San Antonio 2007, no pet.). In *Gardner*, the parties agreed to joint managing conservatorship of the children at issue, and the only remaining custody issue was which joint managing conservator was going to be awarded the right to determine the primary residence. *Id.* The court reasoned that because the "plain words of [section 153.131] do not address or contemplate application of the [parental] presumption to the issue of primary possession, [it] would have to rewrite the statute in order to reach the result in *De La Pena*." *Id.*

I agree with and would adopt the El Paso Court's position, applying the same reasoning as expressed in *Sotelo* and *De La Pena*. In *De La Pena*, the

child's aunt sought managing conservatorship *to the exclusion of both parents in that same role*. *De La Pena*, 999 S.W.2d at 524–25. Because she sought complete exclusion of the parents, the El Paso Court properly applied the statutory presumption (as interpreted by *Brook*) that "the best interest of a child is served if a natural parent is appointed as a managing conservator." *Id.* at 527. Then, in applying the presumption to the primary possession issue, the El Paso Court held and explained that

> as between a parent and nonparent, unless the court finds that appointment of the parent would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development, the parent shall be appointed sole managing conservator *or the parent and nonparent shall be appointed joint managing conservators. If the court chooses the latter, the parent shall be awarded primary possession unless such an order would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development.*[3]

*Id.* at 534–35 (emphasis added).

Our precedent establishes that the basis of the "deeply embedded" statutory parental presumption is to protect the "natural affection usually flowing between parent and child." *In re M.N.G.*, 113 S.W.3d 27, 35 (Tex. App.—Fort Worth 2003, no pet.). Also, a parent's rights to "the

---

[3] ... This language signals the El Paso Court's opinion that where a court *does not* find significant impairment under the parental presumption, appointment of parents alongside nonparents as joint managing conservators is still proper because in such a situation, the parents have not been excluded from managing conservatorship. *Id.*; *see Brook*, 881 S.W.2d at 299–300.

companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). Implicit in these rights is the right to decide where one's child is to reside.

The majority says that applying the parental presumption to which joint managing conservator has the right to determine a child's primary residence would require us to "legislate from the bench."[4] Majority op. at 14. But the family code supports the application of the presumption even when nonparents are designated as joint managing conservators without applying the presumption under circumstances like those in *Brook*. As the El Paso Court explained, "Section 153.372(b) [of the family code] provides that the procedural and substantive standards regarding a court-ordered joint managing conservatorship provided by Subchapter C of the Family Code apply to a nonparent joint managing conservator. The very first section of Subchapter C contains the parental presumption." *De La Pena*, 999 S.W.2d at 534; *see* Tex. Fam. Code Ann. § 153.372(b) (Vernon 2008).

---

[4] ... The majority uses the "legislate from the bench" pejorative phrase in an attempt to show why it would not apply the parental presumption to the right to determine Ryder's primary residence, but it does not explain why that same phrase would not apply to its own expansive interpretation of section 153.131 when that section applies to the appointment of both parents as a child's managing conservators.

Other sections of the family code also support presuming that parents should maintain the right to designate a child's primary residence, which, as our supreme court has explained, is a crucial component of managing conservatorship. *See Phillips v. Beaber*, 995 S.W.2d 655, 660–61 (Tex. 1999) (equating the right of primary possession with "custody" and adding that primary possession and establishing a child's residence are "core rights of managing conservatorship"); *see also Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000) (explaining that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests"). For instance, the very first section of the conservatorship chapter of the family code relates that the state's public policy is to "assure that children will have frequent and continuing contact with parents." Tex. Fam. Code Ann. § 153.001(a)(1) (Vernon 2008). Another section of the code states that "[i]t is the policy of this state to . . . optimize the development of a close and continuing relationship between each parent and child." *Id.* § 153.251(b) (Vernon 2008).

I would hold that erasing the parental presumption in an original suit on custody when a court appoints multiple parties as managing conservators but gives primary possession to a nonparent would weaken these constitutional and statutory interests and would create an unintended result by placing the parent

11

and nonparent on equal ground for the trial court's real custody determination. Thus, because I agree with the majority that the evidence in this case is insufficient to support the trial court's finding that the Grandparents rebutted the parental presumption, I would reverse the provisions of the trial court's order pertaining to the Grandparents' right to determine Ryder's primary residence and remand this case for further proceedings related to those provisions. I would also sustain Roger's sole issue and reverse the portion of the order limiting Roger's access to and possession of Ryder because as all parties have agreed, there is no evidence in the record supporting that limitation.

### Conclusion

For these reasons, I respectfully dissent to the portion of the majority's opinion and judgment reversing the trial court's appointment of the Grandparents and Parents together as Ryder's joint managing conservators, but I concur with the majority's remand of the case for further proceedings.

TERRIE LIVINGSTON
JUSTICE

DELIVERED: September 17, 2009

12