

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-07-445-CV

IN THE INTEREST OF L.A.F.,
A CHILD

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Mark (Father) and Christina (Mother) married and had a daughter, L.A.F., born in June 1998.  L.A.F. has Downs Syndrome.  When L.A.F. was almost three years old, Father and Mother divorced.  L.A.F. lived with Mother.  Father filed a petition to modify the parent-child relationship in January 2005, which was transferred to Wise County and assigned Cause No. 05-02-102.  Agreed temporary orders signed in February 2005 left L.A.F. primarily in the care of Mother but allowed Father greater possession than a standard possession order.

---

[1] *See* Tex. R. App. P. 47.4.

Father died in November 2006; the case was still pending. L.A.F.'s paternal grandmother, Cleta (Grandmother), filed a petition to intervene in Cause No. 05-02-102 as well as an original petition in suit affecting the parent-child relationship (SAPCR) almost three weeks after Father's death. Grandmother's SAPCR was assigned Cause No. 06-11-881. In December 2006, Father's widow, Donna (Stepmother), filed a petition to intervene in the modification suit and L.A.F.'s paternal grandfather, Jeff (Grandfather), and his wife filed a petition to intervene in Grandmother's SAPCR.

The final order in the modification suit was signed on March 13, 2007. On that same day, Grandmother's SAPCR was consolidated with Cause No. 05-02-102. After a bench trial in the SAPCR, the trial court named Mother and Grandmother joint managing conservators of L.A.F. and gave Grandmother the exclusive right to designate L.A.F.'s primary residence. The SAPCR order was signed November 19, 2007.

In two points, Mother challenges Grandmother's standing to seek managing conservatorship and the trial court's order awarding Grandmother joint managing conservatorship and appears to challenge the standing of Grandfather, who was named a possessory conservator in the final orders of both the modification suit and the SAPCR. Because we hold that Grandfather's possessory rights stem from an agreed final order that was not appealed; that

2

Grandmother established standing to file an original suit seeking managing conservatorship; and that, on this record, we cannot conclude that the trial court abused its discretion in naming her joint managing conservator with the exclusive right to establish L.A.F.'s primary residence, we affirm the trial court's judgment.

In her second point, Mother argues that "Appellees" lack standing. A party's standing to pursue a claim is an issue of law that we review de novo.[2] To the extent that Mother's second point pertains to Grandfather, the final order in the modification suit states that on December 11, 2006, the parties (Stepmother, Grandmother, Grandfather, and Mother) dictated an agreement into the record. As part of the agreement, Grandmother withdrew her petition to intervene in the modification suit. Mother was appointed a parent sole managing conservator with the exclusive right to designate L.A.F.'s primary residence, and Stepmother and Grandfather were appointed nonparent possessory conservators and awarded possession of L.A.F. according to a possession schedule. The order specifically provides that Grandmother "currently has pending a [SAPCR] involving the same child of this proceeding, but that such suit is independent of this cause of action and is not affected by

---

[2] *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999).

this cause of action." The final order in the modification suit was signed on March 13, 2007, and was not appealed.

Mother does not argue that the March 2007 order in the modification suit was not final and appealable. Instead, she argues that the modification suit should have been dismissed or abated after Father died because of that death and that there was no viable suit after Father's death. There is no indication in the record that she sought such dismissal or abatement from the trial court on that ground. Additionally, as the case Mother relies on, *Smelscer v. Smelscer*,[3] points out,

> Once a trial court in which parties initiate divorce proceedings thus acquires jurisdiction over the minor children of the marriage and enters temporary orders concerning their custody, such orders survive any subsequent dismissal of the underlying divorce action and continue in effect until a court of competent jurisdiction modifies them or provides for permanent custody of the children. . . . [A] trial court's jurisdiction over minor children is "sticky" and is a product of the continuing need to act, or to at least be able to act, in the best interest of the children.[4]

The trial court here had entered a temporary order before Father died. Finally, to the extent that Mother is implicitly arguing that the March 2007 order in the

---

[3] 901 S.W.2d 708 (Tex. App.—El Paso 1995, no writ).

[4] *Id.* at 711 n.4 (citations omitted).

4

modification suit is void, we note that she failed to appeal this final order directly.[5]  This attack is therefore collateral:

> There is no set procedure for a collateral attack and no statute of limitations.  A collateral attack may be used to set aside a judgment that is void or involves fundamental error.  However, the ability to collaterally attack a judgment is limited because we presume the validity of the judgment under attack, and extrinsic evidence may not be used to establish a lack of jurisdiction.  To prevail on a collateral attack, the challenger must show that the judgment is void on its face.  A collateral attack fails if the judgment contains jurisdictional recitals, even if other parts of the record show a lack of jurisdiction.[6]

The March 13, 2007 final order in the modification suit provides, "The Court, after examining the record and the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case."  The order also provides,

> Respondent, [Mother], appeared in person and through attorney of record . . . and announced ready for trial.
>
> . . . .
>
> The Court finds that the parties have entered into an agreement regarding this final order and that the agreement is in the best interest of the child.  IT IS ORDERED that the agreed final order, as dictated into the record of this Court, is accepted by the Court and is made this Court's Order.

---

[5] *See* Tex. R. App. P. 26.1(b).

[6] *In re A.G.G.*, 267 S.W.3d 165, 169 (Tex. App.—San Antonio 2008, pet. denied) (citations omitted); *see also In re J.W.L.*, 291 S.W.3d 79, 84 (Tex. App.—Fort Worth 2009, orig. proceeding).

The order names Grandfather a non-parent possessory conservator, gives him certain rights and duties, and awards him possession of L.A.F. for one overnight visit each month and for a week in the summer. Mother does not challenge the jurisdictional recitations or her agreement to this order. Accordingly, we hold that the trial court did not err by later awarding Grandfather, who was already a possessory conservator under the modification order, almost identical rights in the November 2007 SAPCR order.

To the extent that Mother challenges Grandmother's standing to bring and maintain the SAPCR, we agree with Grandmother that she established such standing under section 102.004 of the family code. Section 102.004(a)(1) provides that grandparents (among others) may file an original SAPCR "if there is satisfactory proof to the court that . . . the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development."[7] Attached to Grandmother's response to Mother's motion for summary judgment and incorporated in Grandmother's response to Mother's motion to dismiss are several exhibits that reveal the following:

- In June 2007, Mother saw Robert Farias walking on the road and gave him a ride to an Exxon gas station at the intersection of U.S. 81/287 and

---

[7] Tex. Fam. Code Ann. § 102.004(a)(1) (Vernon Supp. 2009).

Farm Road 51 in Decatur. Estranged husband Ruben aka Leonardo DeLuna was working across the street and spotted them. He then came over and argued with them. Farias got out of the vehicle, and DeLuna stabbed him in the back with a pocket knife;

- In her May 2007 deposition, Mother stated that she and DeLuna had been back together since December 2006, that she thought that they would be together from then on, and that she planned for him to continue to be a part of the household, a part of the child rearing, and a part of L.A.F.'s life;

- The police were called to Mother's home in January 2007 because she and her estranged husband DeLuna fought over either Mother's continued contact with her boyfriend Farias or Mother's not keeping DeLuna's children away from Farias despite her having filed several police reports regarding his conduct;

- On December 18, 2006, Mother reported that Farias had been calling her house and harassing her, calling more than 100 times in twenty-four hours. She stated that she was afraid of him, that he was supposed to be on lithium, that he supposedly had not taken it for several days, that he was mentally unstable, and that "there was no telling what he would do." She stated that she had been notified on December 16, 2006 that he had tried to kill himself by cutting his throat and that in his calls to her, he had threatened to kill DeLuna and her;

- While Farias was confined in jail from March 2006 until August 4, 2006, Mother and the children regularly visited him twice a week. While Farias was confined in jail from November 10, 2006, to December 16, 2006, Mother visited him twice;

- On November 9, 2006, Farias was arrested for public intoxication, fraudulent possession of identifying information, failure to identify as a fugitive, failure to appear, and littering;

- On August 18, 2006, Farias was arrested for public intoxication and failure to maintain financial responsibility, and on August 26, 2006, after Farias was released from jail, the police were called because Farias and

7

Mother got into a verbal battle while driving down the road—a four-year-old girl was in the car with them;

- Farias was arrested on March 27, 2006, after a report of a domestic disturbance in the home and charged with assault on a public servant, evading arrest, resisting arrest, two counts of criminal mischief, and violating probation. He had thrown a satellite dish through the window of Mother's parents' residence during a fight with her. After his arrest, he kicked out the rear driver side window of a patrol unit. In her interview with the police, Mother stated that "Farias is not supposed to be at the residence, he does not live there and has no belongings at the residence." She also stated that he "is a heroin addict" and was "using Ice" that night. She said that he had threatened her brother with a knife and had assaulted her. She was afraid for her safety and the safety of her children. As Mother tried to escape with her children in her sister's car, with her sister driving, Farias grabbed the passenger side mirror. He fell off after the sister kept driving at Mother's instruction;

- On March 6, 2006, Mother called to report that Farias took 8 Tylenol 3 pills the night before and some hydrocodone tablets on the morning of March 6, and he then took all the medicine in her medicine cabinet that evening. She reported that after he started talking and acting crazy, she took her four children to her mother's house;

- In February 2006, the police came to the home after 911 calls from Mother and Farias during a fight. By the time the police arrived, the fight had ended;

- On December 18, 2005, Farias was arrested for resisting arrest at the home after barricading himself in with a golf club following a disagreement with Mother. Mother's father, Mr. Harwell, reported that Farias had left the home sometime before Thanksgiving after he threatened some family members with a box cutter. When Mother could not get Farias to leave the home on December 18, 2005, she went to her father for help;

- In November 2005, Mother reported that Farias had threatened her and thrown clothes, had left, and had returned with a knife (but her brother had a gun) and had left again. Mother reported that Farias had been

8

drinking, had started acting strangely, had quoted scripture but had then begun "talking about an alternative dimension filled with demons," and had screamed "that they all were demons and that they were evil." He then went to get more beer. After he returned, Mother's mother told him that he needed to leave. He gathered his clothes, threw them at Mother, and started flicking his lighter in the air and towards his shirt. Only at that point did Mother gather her children and take them next door to her parents' house;

- In July 2005, Mother called to report that DeLuna had been on drugs for the past two years, that he was acting strangely and paranoid and saying that someone was going to die, and that two people came by the house to buy drugs that day. She claimed that she did not know if he was selling drugs and was staying next door at her parents' house with the kids. A few hours after that call, she reported a family disturbance, stating that DeLuna was on drugs and alcohol and would hurt "them." The dispatch officer could hear the children crying. Mother reported that she locked herself and the children in the bathroom, ostensibly to get away from DeLuna.

- DeLuna was arrested on December 28, 2003, for a domestic violence incident against Mother in the children's presence, and he was arrested in April 2004 for a terroristic threat—he and Mother had argued about his "drug problem," and he had threatened Mother with a crowbar after she told him to leave the home and he could not find his keys. At the time, she reported that he was "on ice and all strung out and high." She also reported that he had retrieved some drug paraphernalia from an outbuilding when he was attempting to leave.

Based on the above evidence, we agree with the trial court's conclusion that Grandmother established standing to bring and maintain the SAPCR.[8] We overrule Mother's second point.

---

[8] *See id.*; *In re Pharis*, No. 12-06-00350-CV, 2006 WL 3735107, at *1–3 (Tex. App.—Tyler Dec. 20, 2006, orig. proceeding) (mem. op.).

9

In her first point, Mother contends that Grandmother did not establish that L.A.F.'s present circumstances would significantly impair her physical health or emotional development.  Section 153.131 of the family code provides in relevant part that "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator . . . of the child" and that "[i]t is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child."[9]  As this court has already explained,

> Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent, will probably cause that harm.  This is a heavy burden that is not satisfied by merely showing that the non-parent would be a better custodian of the child.  "Close calls" should be decided in favor of the parent.
>
> Evidence of past misconduct is not alone sufficient to show present unfitness.  If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling.[10]

---

[9] *See* Tex. Fam. Code Ann. § 153.131 (Vernon 2008).

[10] *Critz v. Critz*, No. 02-08-00015-CV, 2009 WL 2972619, at *6 (Tex. App.—Fort Worth Sept. 17, 2009, no pet. h.) (citations and quotation marks omitted).

However, an adult's future conduct may be determined in part by her recent past conduct, and specific acts or omissions of a parent that would likely cause significant impairment to her child's health or emotional development may be inferred from direct evidence.[11]

The trial court found the following:

### Findings of Fact – Conservatorship[12]

1.  This . . . matter involves the interest of the following child under the age of eighteen years:

    Name:           L.A.F.
    Sex:            Female
    Birth date:     06/08/98

2.  L.A.F. is a special needs child who is afflicted with Downs Syndrome.

3.  Grandmother is the paternal grandmother of L.A.F. and the mother of Father.

4.  Mother is the mother of L.A.F.

5.  Grandmother filed an Original [SAPCR] on November 22, 2006. It was subsequently consolidated into the above styled matter, which had previously been a custody matter between Father and Mother.

---

[11] *In re K.R.P.*, 80 S.W.3d 669, 677 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

[12] The names in these findings of fact have been modified to reflect the names used in the opinion.

6. Father and Mother were divorced on May 22nd, 2001. Father filed a petition to modify the parent child relationship on January 6th, 2005, in Denton County. Said matter was ultimately transferred to Wise County on February 4th, 2005.

7. Grandfather is the paternal grandfather of L.A.F. and filed a Petition in Intervention of Grandparents in Suit Affecting the Parent-Child Relationship.

8. After the divorce between Mother and Father, Mother began a sexual relationship with Leonardo Ruben DeLuna, which included cohabitation.

9. On or about 03/08/02 Mother married Leonardo Ruben DeLuna, a citizen of Mexico, but not a citizen of the United States.

10. On or about 05/22/02 Mother was arrested for theft of stolen property.

11. On or about 06/14/03 Mother made a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna had been drinking and had assaulted her before leaving the residence. While deputies were at the residence Leonardo Ruben DeLuna contacted the residence by telephone and spoke to the deputy. His speech was slurred and he was incoherent.

12. On or about 12/7/03 Mother made a 911 emergency call from her residence and advised that Leonardo Ruben DeLuna was causing problems. She reported that he had been behind the residence smoking weed and had taken a bag of marijuana ou[t] of the ice box of her residence.

13. On or about 12/28/03 Mother made a 911 emergency hang-up call from her residence. When deputies arrived she reported that Leonardo Ruben DeLuna had assaulted her and broke the telephone(s) she was dialing 911 with.

12

14. On or about 4/25/04 Mother made a 911 emergency call from her residence and reported that 2 of her children (ages 4 and 2) and her niece (age 3) were missing from the residence. Law enforcement personnel found the children at an old dairy down the road.

15. On or about 4/29/04 Mother made a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna had threatened her with a crowbar. She also reported that he was on "ice" and was strung out and high, and had removed drug paraphernalia from a shed on the residential property. She also stated that she feared for her life because of his rage and only lets him stay there so he will not beat her up.

16. On or about 05/01/04 Mother contacted the Wise County Sheriff's Office and reported that Leonardo Ruben DeLuna was yelling at her. Deputy advised that since they were married he (Ruben) could be at the residence.

17. On or about 05/03/04 Mother made a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna was on a lot of dope, was tripping out on things and hallucinating. She advised that he was outside all night shooting a rifle. She further advised that he had not been working because of drug addiction.

18. On or about 09/22/04 Leonardo Ruben DeLuna was arrested for outstanding warrants.

19. On or about 09/26/04 Mother interfered in a DWI traffic stop involving her friend, Josafat Rodriguez.

20. On or about 3:50 p.m. on 07/30/05 Mother made a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna had a crack pipe in his pants, he was acting strangely and saying that someone was going to die. She further advised that two individuals had come and bought drugs earlier in the day.

13

21. On or about 10:39 p.m. on 07/30/05 Mother made a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna was on drugs and alcohol and will "hurt them." The 911 operator reported hearing children crying during the phone call. Mother advised that they would lock themselves in the bathroom.

22. In approximately 2005 Mother began having an extramarital affair with Robert (Jackie) Farias.

23. On or about 11/22/05 Mother made a 911 emergency call from her residence and reported that Robert (Jackie) Farias had threatened her. She also reported that Mr. Farias had a knife and that her brother had a firearm.

24. On or about 12/18/05 . . . a call was made to the Wise County Sheriff's Office regarding a disturbance at Mother's residence involving Robert (Jackie) Farias. It was reported that he had threatened Mother's family members with a box cutter and was armed with a golf club. Deputies found Robert Jackie Farias hiding underneath a baby crib in her residence where he resisted arrest.

25. On or about 1:35 a.m. on 02/19/06 Robert (Jackie) Farias made a 911 emergency call from Mother's residence. Dispatcher could hear a female in the background telling him to hang up, then the line disconnected. At approximately 1:37 a.m. a female called back advising boyfriend wanted to leave. A male subject was in the background and was stating he had a knife before the line disconnected. At approximately 1:45 a.m. [a] female complainant called back to say there was no emergency, no argument. Deputy arrived on scene and found Robert (Jackie) Farias and Mother at the residence. Both subjects stated that they had been verbally arguing and had made up.

26. On or about 9:47 p.m. on 03/06/06 Mother made a 911 emergency call from her residence and reported that Robert (Jackie) Farias had taken (20) hydrocodone, (10) ibuprofen,

14

(3) ciproflaxin, (30) clindmycin, (20) methylin and (15) phenazoprid after an argument. She reported taking her children to her mother's house and that Robert (Jackie) Farias had locked himself in her residence before leaving the premises. Deputies searched the property and advised her to call back if he returned.

27. On or about 11:25 p.m. on 03/06/06 Mother made a second 911 emergency call from her residence and reported that Robert (Jackie) Farias had returned and was having vomiting and stomach pain. Emergency personnel arrived and transported him to Wise Regional hospital.

28. On or about 03/08/06 Mother contacted the Wise County Sheriff's Office and reported that Robert (Jackie) Farias had damaged her vehicle.

29. On or about 03/28/06 Mother made a 911 emergency call from her residence to report a domestic disturbance involving Robert (Jackie) Farias. She reported that he had been using "ice" and reported that he had threatened her brother with a knife, had assaulted her, and had thrown a satellite dish through her parents' window (next door). She also reported being afraid for her safety as well as the safety of her family. Deputies found him lying on a bed in the residence pretending to be asleep. He resisted arrest, assaulted the deputy and kicked out the rear driver window of the patrol unit. Mr. Farias was completely out of control which necessitated using pepper spray twice.

30. On or about 08/18/06 Decatur Police Department arrested Robert (Jackie) Farias for public intoxication. He resisted arrest and attempted multiple times to break the rear driver side window of the patrol unit.

31. On or about 08/26/06 an anonymous call was made to 911 involving Mother and Robert (Jackie) Farias. He reported that the woman had a 4 year old child with her and had asked for help. The two were arguing and then the male ran across

15

the field. Mother advised the deputy that they were arguing. He located Farias coming out of the woods who confirmed the story. He would go to a friend's house, she would go to her parents' house.

32. On or about 11/10/06 Decatur Police Department arrested Robert (Jackie) Farias for public intoxication. He was also in the possession of other individuals' identifications. He was arrested on warrants, etc.

33. On or about 12/17/06 Mother contacted the Wise County Sheriff's Office regarding Robert (Jackie) Farias. She reported that he has just been released from the hospital and was going to kill her. She also advised that he is on Lithium and is not taking it.

34. On or about 12/18/06 Mother contacted the Wise County Sheriff's Office regarding Robert (Jackie) Farias. She reported that he had telephoned her over 100 times in 24 hours. She further reported that she is afraid for her life because he is extremely unstable and that he had threatened to kill her and Leonardo Ruben DeLuna.

35. On or about 01/07/07 an anonymous call was made to the Wise County Sheriff's Office involving a couple fighting at Mother's residence. Deputies arrived and found Leonardo Ruben DeLuna who reported they had a verbal argument over her taking their children around Robert (Jackie) Farias. Mother then contacted the Sheriff's Office to inquire who had made the call to them. They asked her to go to the Sheriff's Office where they met her. She confirmed what had happened.

36. On or about 04/04/07 Robert (Jackie) Farias was transferred from the Hays County Jail to Wise County Sheriff's Office for booking on outstanding warrants.

37. On or about 06/13/07 Mother was traveling with Robert (Jackie) Farias on Highway 51 South in front of the Exxon

16

and Tractor Supply in Decatur. They pulled into the Exxon station. Leonardo Ruben DeLuna was mowing in front of Tractor Supply when he saw his wife with Robert (Jackie) Farias. Leonardo Ruben DeLuna proceeded over to the Exxon where he stabbed Robert (Jackie) Farias in the back with a knife. He was arrested and Robert (Jackie) Farias was care-flighted to Fort Worth. Leonardo (Ruben) DeLuna was arrested for assault and remains in the Wise County Jail with no bond on an immigration hold.

38. Mother is fluent in Spanish and has visited with Leonardo (Ruben) DeLuna's parents in Mexico.

39. On or about 07/27/07 Robert (Jackie) Farias was transferred from Dallas County to Wise County Sheriff's Office for booking on outstanding warrants.

40. On or about 08/25/07 Robert (Jackie) Farias and Leonardo Ruben DeLuna were both incarcerated at the Wise County Jail. Mother came to visit Leonardo Ruben DeLuna. At the same time Robert (Jackie) Farias was placed in the visitation area to visit with another individual. Robert (Jackie) Farias proceeded to wave through the glass window at Mother. Leonardo Ruben DeLuna initiated a fight with Robert (Jackie) Farias. The fight was broken up by the jailers and both inmates were immediately removed from the area.

41. On or about 07/10/07 Mother filed for divorce from Leonardo Ruben DeLuna. Said divorce has never been finalized.

42. Mother has an extensive and repeated history of visiting both Robert (Jackie) Farias and Leonardo Ruben DeLuna at the Wise County Jail.

43. Mother has taken L.A.F. to the Wise County Jail for visitation of Robert (Jackie) Farias and/or Leonardo Ruben DeLuna.

17

44. Mother has put her children in harm's way by subjecting them to repeated incidences of violence, and persons with extensive criminal histories of drug and alcohol abuse.

45. Mother has had illicit drugs and drug paraphernalia at her residence.

46. Mother has reported that persons have bought drugs from her residence.

47. Mother will continue to put her children in harm's way by subjecting them to repeated incidences of violence, and persons with extensive criminal histories of drug and alcohol abuse.

48. Mother is unemployed and has a history of unsteady employment.

49. Mother's earnings are solely inadequate to support herself and her children.

50. Mother has never been able to carry health insurance on L.A.F.

51. Mother has filed fraudulent federal income tax returns.

52. Mother has filed fraudulent applications with the Texas Health and Human Services Commission and received food stamps based upon such information.

53. There are multiple fighting cocks on the property that Mother's residence is located upon.

54. Mother's father has in the past raised fighting cocks on the property that Mother's residence is upon.

55. Mother has allowed her son to attend a cock fight with her father, Donald Harwell.

56. Mother has opened a phone account in the name of L.A.F. which has resulted in a negative credit rating on L.A.F.

57. L.A.F. has had numerous unexcused absences and tardies from school while in the possession of Mother.

58. Mother has been contacted on numerous occasions by school personnel that L.A.F. was dressed inappropriately.

59. Mother has failed to establish and maintain a suitable, stable residence prior to and during the pendency of this suit.

60. Mother has failed to provide consistent transportation for L.A.F. to speech therapy.

61. The educational needs of L.A.F. will be better served while in possession of Grandmother.

62. Grandmother will initiate and provide adequate therapies as needed by L.A.F.

63. Grandmother is loving and supportive of L.A.F.

64. Grandmother has a history of steady employment and has an excellent work record and recommendation from her current employer.

65. Grandmother makes approximately $50,000 annually and has a full benefit package which will provide medical, dental and vision insurance for L.A.F.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions.[13] When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to

---

[13] *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.[14]  Mother does not challenge the findings.

Based on the trial court's extensive findings and our own review of the record, we cannot hold that the trial court abused its discretion by concluding that (1) the order changing custody is necessary because L.A.F.'s circumstances would significantly impair her physical health or emotional development; (2) Grandmother has overcome the presumption that a parent acts in the best interest of her child; and (3) the appointment of Mother as the joint managing conservator with the right to designate the primary residence would not be in L.A.F.'s best interest because it would significantly impair her physical health, emotional development, or both.  Accordingly, we overrule Mother's first point.

Having overruled Mother's two points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED:  November 5, 2009

---

[14] *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied).