COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-07-445-CV

 

 

IN THE INTEREST OF L.A.F.,

A CHILD

 

                                              ------------

 

              FROM
THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Mark
(Father) and Christina (Mother) married and had a daughter, L.A.F., born in
June 1998.  L.A.F. has Downs
Syndrome.  When L.A.F. was almost three
years old, Father and Mother divorced. 
L.A.F. lived with Mother.  Father
filed a petition to modify the parent-child relationship in January 2005, which
was transferred to Wise County and assigned Cause No. 05-02-102.  Agreed temporary orders signed in February
2005 left L.A.F. primarily in the care of Mother but allowed Father greater
possession than a standard possession order. 
Father died in November 2006; the case was still pending.  L.A.F.=s
paternal grandmother, Cleta (Grandmother), filed a petition to intervene in
Cause No. 05-02-102 as well as an original petition in suit affecting the
parent-child relationship (SAPCR) almost three weeks after Father=s
death.  Grandmother=s SAPCR
was assigned Cause No. 06-11-881.  In
December 2006, Father=s widow, Donna (Stepmother),
filed a petition to intervene in the modification suit and L.A.F.=s
paternal grandfather, Jeff (Grandfather), and his wife filed a petition to
intervene in Grandmother=s SAPCR.

The
final order in the modification suit was signed on March 13, 2007.  On that same day, Grandmother=s SAPCR
was consolidated with Cause No. 05-02-102. 
After a bench trial in the SAPCR, the trial court named Mother and
Grandmother joint managing conservators of L.A.F. and gave Grandmother the
exclusive right to designate L.A.F.=s
primary residence.  The SAPCR order was
signed November 19, 2007.








In two
points, Mother challenges Grandmother=s
standing to seek managing conservatorship and the trial court=s order
awarding Grandmother joint managing conservatorship and appears to challenge
the standing of Grandfather, who was named a possessory conservator in the
final orders of both the modification suit and the SAPCR.  Because we hold that Grandfather=s
possessory rights stem from an agreed final order that was not appealed; that
Grandmother established standing to file an original suit seeking managing
conservatorship; and that, on this record, we cannot conclude that the trial
court abused its discretion in naming her joint managing conservator with the
exclusive right to establish L.A.F.=s
primary residence, we affirm the trial court=s
judgment.








In her
second point, Mother argues that AAppellees@ lack
standing.  A party=s
standing to pursue a claim is an issue of law that we review de novo.[2]  To the extent that Mother=s second
point pertains to Grandfather, the final order in the modification suit states
that on December 11, 2006, the parties (Stepmother, Grandmother, Grandfather,
and Mother) dictated an agreement into the record.  As part of the agreement, Grandmother
withdrew her petition to intervene in the modification suit.  Mother was appointed a parent sole managing
conservator with the exclusive right to designate L.A.F.=s
primary residence, and Stepmother and Grandfather were appointed nonparent
possessory conservators and awarded possession of L.A.F. according to a
possession schedule.  The order
specifically provides that Grandmother Acurrently
has pending a [SAPCR] involving the same child of this proceeding, but that
such suit is independent of this cause of action and is not affected by this
cause of action.@ 
The final order in the modification suit was signed on March 13, 2007,
and was not appealed.

Mother
does not argue that the March 2007 order in the modification suit was not final
and appealable.  Instead, she argues that
the modification suit should have been dismissed or abated after Father died
because of that death and that there was no viable suit after Father=s
death.  There is no indication in the
record that she sought such dismissal or abatement from the trial court on that
ground.  Additionally, as the case Mother
relies on, Smelscer v. Smelscer,[3]
points out, 

Once a trial court in which parties initiate divorce proceedings thus
acquires jurisdiction over the minor children of the marriage and enters
temporary orders concerning their custody, such orders survive any subsequent
dismissal of the underlying divorce action and continue in effect until a court
of competent jurisdiction modifies them or provides for permanent custody of
the children.  . . . [A] trial
court=s jurisdiction over minor
children is Asticky@ and is a product of the
continuing need to act, or to at least be able to act, in the best interest of
the children.[4]

 








The trial court here had entered
a temporary order before Father died. 
Finally, to the extent that Mother is implicitly arguing that the March
2007 order in the modification suit is void, we note that she failed to appeal
this final order directly.[5]  This attack is therefore collateral:

There is no set procedure for a collateral attack and no statute of
limitations.  A collateral attack may be
used to set aside a judgment that is void or involves fundamental error.  However, the ability to collaterally attack a
judgment is limited because we presume the validity of the judgment under
attack, and extrinsic evidence may not be used to establish a lack of
jurisdiction.  To prevail on a collateral
attack, the challenger must show that the judgment is void on its face.  A collateral attack fails if the judgment
contains jurisdictional recitals, even if other parts of the record show a lack
of jurisdiction.[6]

 

The March 13, 2007 final order
in the modification suit provides, AThe
Court, after examining the record and the evidence and argument of counsel,
finds that it has jurisdiction of this case and of all the parties and that no
other court has continuing, exclusive jurisdiction of this case.@  The order also provides,

Respondent, [Mother], appeared in person and
through attorney of record . . . and announced ready for trial.

 

. . . .

 

The Court finds that the parties have entered
into an agreement regarding this final order and that the agreement is in the
best interest of the child.  IT IS
ORDERED that the agreed final order, as dictated into the record of this Court,
is accepted by the Court and is made this Court=s Order.








The order names Grandfather a
non-parent possessory conservator, gives him certain rights and duties, and
awards him possession of L.A.F. for one overnight visit each month and for a
week in the summer.  Mother does not
challenge the jurisdictional recitations or her agreement to this order.  Accordingly, we hold that the trial court did
not err by later awarding Grandfather, who was already a possessory conservator
under the modification order, almost identical rights in the November 2007
SAPCR order.

To the
extent that Mother challenges Grandmother=s
standing to bring and maintain the SAPCR, we agree with Grandmother that she
established such standing under section 102.004 of the family code.  Section 102.004(a)(1) provides that
grandparents (among others) may file an original SAPCR Aif there
is satisfactory proof to the court that . . . the order requested is
necessary because the child=s
present circumstances would significantly impair the child=s
physical health or emotional development.@[7]  Attached to Grandmother=s
response to Mother=s motion for summary judgment
and incorporated in Grandmother=s
response to Mother=s motion to dismiss  are several exhibits that reveal the
following:








$       
In June 2007, Mother saw Robert Farias walking on the road and gave
him a ride to an Exxon gas station at the intersection of U.S. 81/287 and Farm
Road 51 in Decatur.  Estranged husband
Ruben aka Leonardo DeLuna was working across the street and spotted them.  He then came over and argued with them.  Farias got out of the vehicle, and DeLuna
stabbed him in the back with a pocket knife;

 

$       
In her May 2007 deposition, Mother stated that she and DeLuna had been
back together since December 2006, that she thought that they would be together
from then on, and that she planned for him to continue to be a part of the
household, a part of the child rearing, and a part of L.A.F.=s life;

 

$       
The police were called to Mother=s home in January 2007 because she and her
estranged husband DeLuna fought over either Mother=s continued contact with
her boyfriend Farias or Mother=s not keeping DeLuna=s children away from
Farias despite her having filed several police reports regarding his conduct;

 

$       
On December 18, 2006, Mother reported that Farias had been calling her
house and harassing her, calling more than 100 times in twenty-four hours.  She stated that she was afraid of him, that
he was supposed to be on lithium, that he supposedly had not taken it for
several days, that he was mentally unstable, and that Athere was no telling what
he would do.@  She stated that she had been notified on
December 16, 2006 that he had tried to kill himself by cutting his throat and
that in his calls to her, he had threatened to kill DeLuna and her;

 

$       
While Farias was confined in jail from March 2006 until August 4,
2006, Mother and the children regularly visited him twice a week.  While Farias was confined in jail from
November 10, 2006, to December 16, 2006, Mother visited him twice;

 

$       
On November 9, 2006, Farias was arrested for public intoxication,
fraudulent possession of identifying information, failure to identify as a
fugitive, failure to appear, and littering;

 








$       
On August 18, 2006, Farias was arrested for public intoxication and
failure to maintain financial responsibility, and on August 26, 2006, after
Farias was released from jail, the police were called because Farias and Mother
got into a verbal battle while driving down the roadCa four-year-old girl was
in the car with them;

 

$       
Farias was arrested on March 27, 2006, after a report of a domestic
disturbance in the home and charged with assault on a public servant, evading
arrest, resisting arrest, two counts of criminal mischief, and violating
probation.  He had thrown a satellite
dish through the window of Mother=s parents= residence during a fight with her.  After his arrest, he kicked out the rear driver
side window of a patrol unit.  In her
interview with the police, Mother stated that AFarias is not supposed to
be at the residence, he does not live there and has no belongings at the
residence.@  She also stated that he Ais a heroin addict@ and was Ausing Ice@ that night.  She said that he had threatened her brother
with a knife and had assaulted her.  She
was afraid for her safety and the safety of her children.  As Mother tried to escape with her children
in her sister=s car, with her sister
driving, Farias grabbed the passenger side mirror.  He fell off after the sister kept driving at
Mother=s instruction;

 

$       
On March 6, 2006, Mother called to report that Farias took 8 Tylenol 3
pills the night before and some hydrocodone tablets on the morning of March 6,
and he then took all the medicine in her medicine cabinet that evening.  She reported that after he started talking
and acting crazy, she took her four children to her mother=s house;

 

$       
In February 2006, the police came to the home after 911 calls from
Mother and Farias during a fight.  By the
time the police arrived, the fight had ended;

 

$       
On December 18, 2005, Farias was arrested for resisting arrest at the
home after barricading himself in with a golf club following a disagreement
with Mother.  Mother=s father, Mr. Harwell,
reported that Farias had left the home sometime before Thanksgiving after he
threatened some family members with a box cutter.  When Mother could not get Farias to leave the
home on December 18, 2005, she went to her father for help;

 








$       
In November 2005, Mother reported that Farias had threatened her and
thrown clothes, had left, and had returned with a knife (but her brother had a
gun) and had left again.  Mother reported
that Farias had been drinking, had started acting strangely, had quoted
scripture but had then begun Atalking about an alternative dimension filled
with demons,@ and had screamed Athat they all were demons
and that they were evil.@  He then went to get more beer.  After he returned, Mother=s mother told him that he
needed to leave.  He gathered his
clothes, threw them at Mother, and started flicking his lighter in the air and
towards his shirt.  Only at that point did
Mother gather her children and take them next door to her parents= house;

 

$       
In July 2005, Mother called to report that DeLuna had been on drugs
for the past two years, that he was acting strangely and paranoid and saying
that someone was going to die, and that two people came by the house to buy
drugs that day.  She claimed that she did
not know if he was selling drugs and was staying next door at her parents= house with the
kids.  A few hours after that call, she
reported a family disturbance, stating that DeLuna was on drugs and alcohol and
would hurt Athem.@  The dispatch officer could hear the children
crying.  Mother reported that she locked
herself and the children in the bathroom, ostensibly to get away from DeLuna.

 

$       
DeLuna was arrested on December 28, 2003, for a domestic violence
incident against Mother in the children=s presence, and he was arrested in April 2004 for
a terroristic threatChe and Mother had argued
about his Adrug problem,@ and he had threatened
Mother with a crowbar after she told him to leave the home and he could not
find his keys.  At the time, she reported
that he was Aon ice and all strung out
and high.@  She also reported that he had retrieved some
drug paraphernalia from an outbuilding when he was attempting to leave.

 

Based on
the above evidence, we agree with the trial court=s
conclusion that Grandmother established standing to bring and maintain the
SAPCR.[8]  We overrule Mother=s second
point.








In her
first point, Mother contends that Grandmother did not establish that L.A.F.=s
present circumstances would significantly impair her physical health or
emotional development.  Section 153.131
of the family code provides in relevant part that Aunless
the court finds that appointment of the parent or parents would not be in the
best interest of the child because the appointment would significantly impair
the child=s physical health or emotional
development, a parent shall be appointed sole managing conservator
. . . of the child@ and
that A[i]t is
a rebuttable presumption that the appointment of the parents of a child as
joint managing conservators is in the best interest of the child.@[9]  As this court has already explained,

Impairment must be proved by a preponderance of
the evidence indicating that some specific, identifiable behavior or conduct of
the parent, demonstrated by specific acts or omissions of the parent, will
probably cause that harm.  This is a
heavy burden that is not satisfied by merely showing that the non-parent would
be a better custodian of the child.  AClose calls@ should be decided in favor
of the parent.

 

Evidence of past misconduct is not alone
sufficient to show present unfitness.  If
the parent is presently a suitable person to have custody, the fact that there
was a time in the past when the parent would not have been a proper person to
have such custody is not controlling.[10]








However, an adult=s future
conduct may be determined in part by her recent past conduct, and specific acts
or omissions of a parent that would likely cause significant impairment to her
child=s health
or emotional development may be inferred from direct evidence.[11]

The
trial court found the following:

                    Findings of Fact B
Conservatorship[12]

1.     This . . . 
matter involves the interest of the following child under the age of
eighteen years:

 

Name:                L.A.F.

Sex:                  Female

Birth date:          06/08/98

 

2.     L.A.F. is a special needs child who is afflicted with Downs
Syndrome.

 

3.     Grandmother is the paternal grandmother of L.A.F. and the mother
of Father.

 

4.     Mother is the mother of L.A.F.

 

5.     Grandmother filed an Original [SAPCR] on November 22, 2006.  It was subsequently consolidated into the
above styled matter, which had previously been a custody matter between Father
and Mother.

 








6.     Father and Mother were divorced on May 22nd,
2001.  Father filed a petition to modify
the parent child relationship on January 6th, 2005, in Denton
County.  Said matter was ultimately transferred
to Wise County on February 4th, 2005.

 

7.     Grandfather is the paternal grandfather of L.A.F. and filed a
Petition in Intervention of Grandparents in Suit Affecting the Parent-Child
Relationship.

 

8.     After the divorce between Mother and Father, Mother began a
sexual relationship with Leonardo Ruben DeLuna, which included cohabitation.

 

9.     On or about 03/08/02 Mother married Leonardo Ruben DeLuna, a
citizen of Mexico, but not a citizen of the United States.

 

10.   On or about 05/22/02 Mother was arrested for
theft of stolen property.

 

11.   On or about 06/14/03 Mother made a 911
emergency call from her residence and reported that Leonardo Ruben DeLuna had
been drinking and had assaulted her before leaving the residence.  While deputies were at the residence Leonardo
Ruben DeLuna contacted the residence by telephone and spoke to the deputy.  His speech was slurred and he was incoherent.

 

12.   On or about 12/7/03 Mother made a 911
emergency call from her residence and advised that Leonardo Ruben DeLuna was causing
problems.  She reported that he had been
behind the residence smoking weed and had taken a bag of marijuana ou[t] of the
ice box of her residence.

 

13.   On or about 12/28/03 Mother made a 911
emergency hang-up call from her residence. 
When deputies arrived she reported that Leonardo Ruben DeLuna had
assaulted her and broke the telephone(s) she was dialing 911 with.








14.   On or about 4/25/04 Mother made a 911
emergency call from her residence and reported that 2 of her children (ages 4
and 2) and her niece (age 3) were missing from the residence.  Law enforcement personnel found the children
at an old dairy down the road.

 

15.   On or about 4/29/04 Mother made a 911
emergency call from her residence and reported that Leonardo Ruben DeLuna had
threatened her with a crowbar.  She also
reported that he was on Aice@ and was strung out and
high, and had removed drug paraphernalia from a shed on the residential
property.  She also stated that she
feared for her life because of his rage and only lets him stay there so he will
not beat her up.

 

16.   On or about 05/01/04 Mother contacted the
Wise County Sheriff=s Office and reported
that Leonardo Ruben DeLuna was yelling at her. 
Deputy advised that since they were married he (Ruben) could be at the
residence.

 

17.   On or about 05/03/04 Mother made a 911
emergency call from her residence and reported that Leonardo Ruben DeLuna was
on a lot of dope, was tripping out on things and hallucinating.  She advised that he was outside all night shooting
a rifle.  She further advised that he had
not been working because of drug addiction.

 

18.   On or about 09/22/04 Leonardo Ruben DeLuna
was arrested for outstanding warrants.

 

19.   On or about 09/26/04 Mother interfered in a
DWI traffic stop involving her friend, Josafat Rodriguez.

 

20.   On or about 3:50 p.m. on 07/30/05 Mother made
a 911 emergency call from her residence and reported that Leonardo Ruben DeLuna
had a crack pipe in his pants, he was acting strangely and saying that someone
was going to die.  She further advised
that two individuals had come and bought drugs earlier in the day.








21.   On or about 10:39 p.m. on 07/30/05 Mother
made a 911 emergency call from her residence and reported that Leonardo Ruben
DeLuna was on drugs and alcohol and will Ahurt them.@  The 911
operator reported hearing children crying during the phone call.  Mother advised that they would lock
themselves in the bathroom.

 

22.   In approximately 2005 Mother began having an
extramarital affair with Robert (Jackie) Farias.

 

23.   On or about 11/22/05 Mother made a 911
emergency call from her residence and reported that Robert (Jackie) Farias had
threatened her.  She also reported that
Mr. Farias had a knife and that her brother had a firearm.

 

24.   On or about 12/18/05 . . . a call was made to
the Wise County Sheriff=s Office regarding a
disturbance at Mother=s residence involving
Robert (Jackie) Farias.  It was reported
that he had threatened Mother=s family members with a box cutter and was armed
with a golf club.  Deputies found Robert
Jackie Farias hiding underneath a baby crib in her residence where he resisted
arrest.

 

25.   On or about 1:35 a.m. on 02/19/06 Robert
(Jackie) Farias made a 911 emergency call from Mother=s residence.  Dispatcher could hear a female in the
background telling him to hang up, then the line disconnected.  At approximately 1:37 a.m. a female called
back advising boyfriend wanted to leave. 
A male subject was in the background and was stating he had a knife
before the line disconnected.  At
approximately 1:45 a.m. [a] female complainant called back to say there was no
emergency, no argument.  Deputy arrived
on scene and found Robert (Jackie) Farias and Mother at the residence.  Both subjects stated that they had been
verbally arguing and had made up.

 








26.   On or about 9:47 p.m. on 03/06/06 Mother made
a 911 emergency call from her residence and reported that Robert (Jackie)
Farias had taken (20) hydrocodone, (10) ibuprofen, (3) ciproflaxin, (30)
clindmycin, (20) methylin and (15) phenazoprid after an argument.  She reported taking her children to her
mother=s house and that Robert
(Jackie) Farias had locked himself in her residence before leaving the
premises.  Deputies searched the property
and advised her to call back if he returned.

 

27.   On or about 11:25 p.m. on 03/06/06 Mother
made a second 911 emergency call from her residence and reported that Robert
(Jackie) Farias had returned and was having vomiting and stomach pain.  Emergency personnel arrived and transported him
to Wise Regional hospital.

 

28.   On or about 03/08/06 Mother contacted the
Wise County Sheriff=s Office and reported
that Robert (Jackie) Farias had damaged her vehicle.

 

29.   On or about 03/28/06 Mother made a 911
emergency call from her residence to report a domestic disturbance involving
Robert (Jackie) Farias.  She reported
that he had been using Aice@ and reported that he had
threatened her brother with a knife, had assaulted her, and had thrown a
satellite dish through her parents= window (next door).  She also reported being afraid for her safety
as well as the safety of her family. 
Deputies found him lying on a bed in the residence pretending to be
asleep.  He resisted arrest, assaulted
the deputy and kicked out the rear driver window of the patrol unit.  Mr. Farias was completely out of control
which necessitated using pepper spray twice.

 

30.   On or about 08/18/06 Decatur Police
Department arrested Robert (Jackie) Farias for public intoxication.  He resisted arrest and attempted multiple
times to break the rear driver side window of the patrol unit.

 








31.   On or about 08/26/06 an anonymous call was
made to 911 involving Mother and Robert (Jackie) Farias.  He reported that the woman had a 4 year old
child with her and had asked for help. 
The two were arguing and then the male ran across the field.  Mother advised the deputy that they were
arguing.  He located Farias coming out of
the woods who confirmed the story.  He
would go to a friend=s house, she would go to
her parents= house.

 

32.   On or about 11/10/06 Decatur Police
Department arrested Robert (Jackie) Farias for public intoxication.  He was also in the possession of other
individuals= identifications.  He was arrested on warrants, etc.

 

33.   On or about 12/17/06 Mother contacted the
Wise County Sheriff=s Office regarding Robert
(Jackie) Farias.  She reported that he
has just been released from the hospital and was going to kill her.  She also advised that he is on Lithium and is
not taking it.

 

34.   On or about 12/18/06 Mother contacted the
Wise County Sheriff=s Office regarding Robert
(Jackie) Farias.  She reported that he
had telephoned her over 100 times in 24 hours. 
She further reported that she is afraid for her life because he is
extremely unstable and that he had threatened to kill her and Leonardo Ruben
DeLuna.

 

35.   On or about 01/07/07 an anonymous call was
made to the Wise County Sheriff=s Office involving a couple fighting at Mother=s residence.  Deputies arrived and found Leonardo Ruben
DeLuna who reported they had a verbal argument over her taking their children
around Robert (Jackie) Farias.  Mother
then contacted the Sheriff=s Office to inquire who had made the call to
them.  They asked her to go to the
Sheriff=s Office where they met
her.  She confirmed what had happened.

 

36.   On or about 04/04/07 Robert (Jackie) Farias
was transferred from the Hays County Jail to Wise County Sheriff=s Office for booking on
outstanding warrants.

 








37.   On or about 06/13/07 Mother was traveling
with Robert (Jackie) Farias on Highway 51 South in front of the Exxon and
Tractor Supply in Decatur.  They pulled
into the Exxon station.  Leonardo Ruben
DeLuna was mowing in front of Tractor Supply when he saw his wife with Robert
(Jackie) Farias.  Leonardo Ruben DeLuna
proceeded over to the Exxon where he stabbed Robert (Jackie) Farias in the back
with a knife.  He was arrested and Robert
(Jackie) Farias was care-flighted to Fort Worth.  Leonardo (Ruben) DeLuna was arrested for
assault and remains in the Wise County Jail with no bond on an immigration
hold.

 

38.   Mother is fluent in Spanish and has visited
with Leonardo (Ruben) DeLuna=s parents in Mexico.

 

39.   On or about 07/27/07 Robert (Jackie) Farias
was transferred from Dallas County to Wise County Sheriff=s Office for booking on
outstanding warrants.

 

40.   On or about 08/25/07 Robert (Jackie) Farias
and Leonardo Ruben DeLuna were both incarcerated at the Wise County Jail.  Mother came to visit Leonardo Ruben
DeLuna.  At the same time Robert (Jackie)
Farias was placed in the visitation area to visit with another individual.  Robert (Jackie) Farias proceeded to wave
through the glass window at Mother. 
Leonardo Ruben DeLuna initiated a fight with Robert (Jackie)
Farias.  The fight was broken up by the
jailers and both inmates were immediately removed from the area.

 

41.   On or about 07/10/07 Mother filed for divorce
from Leonardo Ruben DeLuna.  Said divorce
has never been finalized.

 

42.   Mother has an extensive and repeated history
of visiting both Robert (Jackie) Farias and Leonardo Ruben DeLuna at the Wise
County Jail.

 

43.   Mother has taken L.A.F. to the Wise County
Jail for visitation of Robert (Jackie) Farias and/or Leonardo Ruben DeLuna.

 








44.   Mother has put her children in harm=s way by subjecting them
to repeated incidences of violence, and persons with extensive criminal
histories of drug and alcohol abuse.

 

45.   Mother has had illicit drugs and drug
paraphernalia at her residence.

 

46.   Mother has reported that persons have bought
drugs from her residence.

 

47.   Mother will continue to put her children in
harm=s way by subjecting them
to repeated incidences of violence, and persons with extensive criminal
histories of drug and alcohol abuse.

 

48.   Mother is unemployed and has a history of
unsteady employment.

 

49.   Mother=s earnings are solely inadequate to support
herself and her children.

 

50.   Mother has never been able to carry health
insurance on L.A.F.

 

51.   Mother has filed fraudulent federal income
tax returns.

 

52.   Mother has filed fraudulent applications with
the Texas Health and Human Services Commission and received food stamps based
upon such information.

 

53.   There are multiple fighting cocks on the
property that Mother=s residence is located
upon.

 

54.   Mother=s father has in the past raised fighting cocks on
the property that Mother=s residence is upon.

 

55.   Mother has allowed her son to attend a cock
fight with her father, Donald Harwell.

 








56.   Mother has opened a phone account in the name
of L.A.F. which has resulted in a negative credit rating on L.A.F.

 

57.   L.A.F. has had numerous unexcused absences
and tardies from school while in the possession of Mother.

 

58.   Mother has been contacted on numerous
occasions by school personnel that L.A.F. was dressed inappropriately.

 

59.   Mother has failed to establish and maintain a
suitable, stable residence prior to and during the pendency of this suit.

 

60.   Mother has failed to provide consistent
transportation for L.A.F. to speech therapy.

 

61.   The educational needs of L.A.F. will be
better served while in possession of Grandmother.

 

62.   Grandmother will initiate and provide
adequate therapies as needed by L.A.F.

 

63.   Grandmother is loving and supportive of
L.A.F.

 

64.   Grandmother has a history of steady
employment and has an excellent work record and recommendation from her current
employer.

 

65.   Grandmother makes approximately $50,000
annually and has a full benefit package which will provide medical, dental and
vision insurance for L.A.F.








Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.[13]  When findings of fact are filed and are
unchallenged, they occupy the same position and are entitled to the same weight
as the verdict of a jury; they are binding on an appellate court unless the
contrary is established as a matter of law or there is no evidence to support
the finding.[14]  Mother does not challenge the findings.

Based on
the trial court=s extensive findings and our own
review of the record, we cannot hold that the trial court abused its discretion
by concluding that (1) the order changing custody is necessary because L.A.F.=s
circumstances would significantly impair her physical health or emotional
development; (2) Grandmother has overcome the presumption that a parent acts in
the best interest of her child; and (3) the appointment of Mother as the joint
managing conservator with the right to designate the primary residence would
not be in L.A.F.=s best interest because it would
significantly impair her physical health, emotional development, or both.  Accordingly, we overrule Mother=s first
point.

Having
overruled Mother=s two points, we affirm the
trial court=s judgment.

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  CAYCE, C.J.; DAUPHINOT
and WALKER, JJ.

 

DELIVERED:  November 5, 2009











[1]See Tex. R. App. P. 47.4.





[2]Mayhew v. Town of
Sunnyvale,
964 S.W.2d 922, 928 (Tex. 1998), cert. denied, 526 U.S. 1144 (1999).





[3]901 S.W.2d 708 (Tex. App.CEl Paso 1995, no writ).





[4]Id. at 711 n.4 (citations
omitted).





[5]See Tex. R. App. P. 26.1(b).





[6]In re A.G.G., 267 S.W.3d 165, 169
(Tex. App.CSan Antonio 2008, pet.
denied) (citations omitted); see also In re J.W.L., 291 S.W.3d 79, 84
(Tex. App.CFort Worth 2009, orig.
proceeding).





[7]Tex. Fam. Code Ann. ' 102.004(a)(1)
(Vernon Supp. 2009).





[8]See id.; In re Pharis,
No. 12-06-00350-CV, 2006 WL 3735107, at *1B3 (Tex. App.CTyler Dec. 20, 2006, orig. proceeding) (mem.
op.).





[9]See Tex. Fam. Code Ann. ' 153.131 (Vernon 2008).





[10]Critz v. Critz, No. 02-08-00015-CV,
2009 WL 2972619, at *6 (Tex. App.CFort Worth Sept. 17, 2009, no pet. h.) (citations
and quotation marks omitted).





[11]In re K.R.P., 80 S.W.3d 669, 677
(Tex. App.CHouston [1st Dist.] 2002,
pet. denied).





[12]The names in these
findings of fact have been modified to reflect the names used in the opinion.





[13]Anderson v. City of Seven
Points,
806 S.W.2d 791, 794 (Tex. 1991).





[14]McGalliard v. Kuhlmann, 722 S.W.2d 694, 696
(Tex. 1986); Raman Chandler Props., L.C. v. Caldwell=s Creek Homeowners Ass=n, Inc., 178 S.W.3d 384, 390
(Tex. App.CFort Worth 2005, pet.
denied).