

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00021-CV

IN THE INTEREST OF
K.R.B., A CHILD

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

In two issues, Appellant Amanda G. appeals the trial court's order appointing her and Appellees Laura P. and Hubert P. joint managing conservators of K.R.B., with Appellees having the exclusive right to designate K.R.B.'s primary residence. We will reverse and remand.

---

[1]See Tex. R. App. P. 47.4.

## II. BACKGROUND

Three-year-old K.R.B. was born on September 14, 2006. Amanda is K.R.B.'s mother. Joshua B. is K.R.B.'s presumed father. According to Appellees' original petition, Laura is K.R.B.'s great aunt and Hubert is K.R.B.'s great uncle.

Amanda started using drugs sometime in late 2005 or 2006 (before she became pregnant with K.R.B) and continued using drugs for a period of time after K.R.B. was born. CPS intervened in K.R.B.'s care at some point in May 2007; Amanda had tested positive for methamphetamine and later agreed to a child safety and evaluation plan with Appellees pursuant to which Appellees took possession of K.R.B. in June 2007. According to Laura, the expectation was that Appellees would care for K.R.B. while Amanda "[got] her act together." But in December 2007, after Amanda had been arrested again, Appellees filed an original petition seeking to be appointed sole managing conservators of K.R.B. and requesting temporary orders.[2] Appellees supplemented the original petition with allegations that K.R.B.'s physical health or emotional development would be significantly impaired if a parent were named a managing conservator and that they should be appointed possessory conservators with reasonable possession and access to K.R.B. if they were not named sole managing conservators of

---

[2]CPS had closed its case on K.R.B. in late July 2007, but K.R.B. remained with Appellees.

K.R.B. or joint managing conservators of K.R.B. with the right to establish his primary residence.

Joshua signed a "Father's Affidavit for Voluntary Relinquishment of Parental Rights" in which he stated that he is K.R.B.'s father and that he "freely and voluntarily give[s] and relinquish[es] to [Appellees] all [his] parental rights and duties." Joshua also signed a waiver of service, in which he acknowledged receipt of the original petition and, among other things, waived his appearance at a temporary orders hearing set for August 28, 2008, and "approve[d]" the appointment of Appellees as the managing conservators of K.R.B., believing it to be in K.R.B.'s best interest.[3]

The trial court entered temporary orders in September 2008. It appointed Appellees and Amanda temporary joint managing conservators of K.R.B., with Appellees having the exclusive right to designate K.R.B.'s primary residence. The temporary orders also set out Amanda's visitation schedule with K.R.B., which required supervised visits that eventually phased into a visitation schedule that is consistent with the standard possession order; permitted Appellees to request that Amanda submit to one hair follicle test every thirty days; ordered Amanda to pay Appellees monthly child support; prohibited smoking in the

---

[3]The temporary orders stated that Joshua waived issuance and service of citation by waiver and did not appear. At final trial, Amanda testified that there is a possibility that Joshua, who was in prison at the time, is not K.R.B.'s father, but she acknowledged that the trial did not concern the question of Joshua's parentage.

presence of K.R.B. or in the house while K.R.B. is present; prohibited the consumption of alcohol by any person within twenty-four hours of exercising or supervising visitation of K.R.B.; prohibited "illegal drug use at any time"; and, among other things, prohibited Dustin P., Amanda's former boyfriend, from being present during any of Amanda's visitations.

After a bench trial, the trial court found "by a preponderance of the evidence that the best interests of the child would be to continue the temporary orders into a final order." Therefore, in its final order, the trial court appointed Appellees and Amanda joint managing conservators of K.R.B., with Appellees having the exclusive right to designate K.R.B.'s primary residence. The trial court ordered that Amanda exercise possession of K.R.B. pursuant to the standard possession order but required that overnight periods of possession be supervised by Amanda's mother or father.

Amanda filed a motion for new trial and a request for findings of fact and conclusions of law. The trial court denied the motion for new trial and signed findings of fact and conclusions of law, which included in relevant part the following findings:

3. It is in the best interest of the child that [Appellees] and [Amanda] be appointed joint managing conservators of the child.

4. It is in the best interest of the child that [Appellees] have the right to designate the child's primary residence.

5. Appointing the parents, [Amanda] and [Joshua B.], as the only joint managing conservators of the child would significantly

4

impair the child's physical health or emotional development and appointing [Amanda] as a conservator with the right to establish the child's primary residence would significantly impair the child's physical health or emotional development and would not be in the child's best interest. Some of the facts supporting these findings are as follows:

(a)   That [Amanda] has been neglectful of the child's medical needs.

(b)   That [Amanda] has engaged in a lifestyle involving criminal conduct which creates an unstable and harmful environment for herself and the child.

(c)   That while on deferred adjudication probation for multiple criminal offenses, [Amanda] has knowingly engaged in conduct that violated the terms and conditions of those probations. Such violations could result in her being sentenced to the Texas Department of Corrections.

(d)   That [Amanda] has put her own gratification and needs above the child's needs and welfare.

(e)   That [Amanda] has associated with individuals who have engaged in criminal behavior, and that such associations are not in the best interests of, and pose a risk to, the child.

(f)   That [Amanda] repeatedly engaged in conduct detrimental to herself and the child.

(g)   That the child has been raised almost exclusively by [Appellees] since on or before June 10, 2007.

(h)   That the Petitioners have been significantly involved in raising the child since his birth.

The trial court made one conclusion of law regarding conservatorship: "The evidence supports a finding that the child's physical health or emotional stability would be significantly impaired if the parents were appointed as joint managing conservators."

5

The trial court later entered an additional finding of fact:

7.  Appointing [Amanda] as the sole managing conservator of the child, [K.R.B.], would not be in the child's best interest because it would significantly impair the child's physical health and emotional development. This finding is supported by the evidence, including the following:

    (a)  That [Amanda] has engaged in a [lifestyle] involving serious criminal conduct and associating with persons who engage in such criminal conduct which will create an unstable and harmful environment for the child.

    (b)  That while on deferred adjudication probation for multiple felony offenses, [Amanda] has knowingly engaged in conduct that violated the terms and conditions of those probations and her continuing to make such choices will probably result in her being incarcerated.

    (c)  That [Amanda] has put her own gratification above the child's needs and welfare which would probably lead to significant impairment of the child's physical health and emotional development if [Amanda] were appointed as the child's sole managing conservator. This includes her choices to use drugs, to drink alcohol, to get involved with criminal male partners and to commit criminal offenses.

    (d)  That [Amanda] repeatedly engaged in conduct creating a dangerous living environment for a child, leading to the child in this case being raised almost exclusively by [Appellees] since on or before June 10, 2007 and which lead to [Appellees'] substantial involvement in raising the child, and their being the parental figures for the child, since shortly after the child's birth. It would substantially impair the child's emotional development now to disrupt his relationship with [Appellees] by appointing [Amanda] as his sole managing conservator.

6

## III. CONSERVATORSHIP

In her first issue, Amanda argues that the trial court abused its discretion by naming her and Appellees joint managing conservators of K.R.B. In her second issue, Amanda argues that the evidence is legally and factually insufficient to establish—and that the trial court therefore abused its discretion by finding—that appointing her as the sole managing conservator of K.R.B. or as a joint managing conservator of K.R.B. with the right to designate K.R.B.'s primary residence would not be in his best interest because it would significantly impair his physical health or emotional development.

### A. Standard of Review

We review a trial court's decision regarding the conservatorship of a child under an abuse of discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

7

In an abuse of discretion review, legal and factual insufficiency are not independent grounds for asserting error but are merely relevant factors in assessing whether the trial court abused its discretion. *In re M.P.B.*, 257 S.W.3d at 811. Thus, in applying the abuse of discretion standard, an appellate court in a family law case must apply a two-prong analysis: (1) whether the trial court had sufficient evidence upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion. *In re M.C.F.*, 121 S.W.3d 891, 895 (Tex. App.—Fort Worth 2003, no pet.).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

8

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## B.    Parental Presumption

The presumption that the best interest of the child is served by awarding custody to the parent is deeply embedded in Texas law. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990)). The legislature codified the presumption in chapter 153 of the family code. *Id.* Section 153.131(a) provides as follows:

> Subject to the prohibition in Section 153.004,[4] unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

[4]Section 153.004 states in relevant part that in determining conservatorship, a court shall consider evidence of the intentional use of abusive physical force and that a court may not "appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child . . . that results in the other parent becoming pregnant with the child." Tex. Fam. Code Ann. § 153.004(a), (b) (Vernon 2008).

Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008). Thus, the nonparent can rebut the parental presumption by showing that the appointment of the parent would "significantly impair the child's physical health or emotional development." *Id.*; *see V.L.K.*, 24 S.W.3d at 341.

Section 153.131(a) creates a "strong presumption" in favor of parental custody and imposes a "heavy burden" on a nonparent. *Lewelling*, 796 S.W.2d at 167. Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent, will probably cause that harm. *Id.*; *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.). This link between the parent's conduct and harm to the child may not be based on evidence that raises mere surmise or speculation of possible harm. *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.); *In re M.W.*, 959 S.W.2d 661, 665 (Tex. App.—Tyler 1997, writ denied). The nonparent's heavy burden is not satisfied by merely showing that the nonparent would be a better custodian of the child, and "close calls" should be decided in favor of the parent. *Lewelling*, 796 S.W.2d at 166–68.

Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent. *De La Pena*, 999 S.W.2d at 528. When determining fitness of a parent, the material time to consider is the present. *M.W.*, 959 S.W.2d at 666. "If the parent is presently a suitable person

10

to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied). Evidence of past misconduct may not by itself be sufficient to show present unfitness. *Id.*

### C. Appointment of Appellees and Amanda

In her first issue, Amanda contends that the trial court abused its discretion by appointing both Appellees and her as joint managing conservators of K.R.B. because it "failed to give the proper weight to the parental presumption" in section 153.131. She argues that the trial court did not have the option under section 153.131 to appoint both her and Appellees joint managing conservators of K.R.B and that the trial court did not apply the parental presumption articulated in section 153.131 but instead applied only a best interest standard.

Section 153.372 authorizes a trial court to appoint both parents and nonparents as joint managing conservators. Tex. Fam. Code Ann. § 153.372(a) (Vernon 2008). Regarding the parental presumption in such a case, in *Critz* this court reasoned that "[t]here is no language in section 153.131 that indicates that the [parental] presumption is inapplicable to the appointment of non-parents as joint managing conservators when the trial court *also appoints one or both parents*." *Critz*, 297 S.W.3d at 471 (emphasis added). In other words, section 153.131(a) demands that the parental presumption apply when a nonparent seeks managing conservatorship in lieu of or in addition to the parent. *Id.*

11

Here, the trial court's findings of fact track the language of section 153.131(a) and demonstrate that it applied the parental presumption to the determination of managing conservatorship, notwithstanding that it appointed both Amanda and Appellees as joint managing conservators of K.R.B. but found that it is not in K.R.B.'s best interest for Amanda to be appointed sole managing conservator or joint managing conservator along with Joshua. Amanda's interpretation of section 153.131(a) conflicts with the plain language of section 153.372(a). We overrule Amanda's first issue.

### D. Overcoming the Parental Presumption

In her second issue, Amanda challenges the legal and factual sufficiency of the evidence to establish that appointing her as sole managing conservator or as a managing conservator with the right to designate K.R.B.'s primary residence would not be in K.R.B.'s best interest because it would significantly impair his physical health or emotional development.[5] We will examine the sufficiency of the evidence to support the trial court's seventh finding of fact that appointing Amanda as sole managing conservator is not in K.R.B.'s best interest.

---

[5]Amanda does not challenge the part of the trial court's fifth finding of fact that appointing both her and Joshua as the only joint managing conservators would significantly impair K.R.B.'s physical health or emotional development.

12

### 1. Evidence

#### a. Amanda

Amanda testified that she is twenty-three years old, that she moved in with her mother in September 2007, and that she has been kicked out of Section 8 housing twice. She has another child, K.G., who is three months old. Kenneth G. is K.G.'s father. Amanda started dating Kenneth in October 2008. Amanda explained that Joshua is in prison, that she started dating Dustin in June 2007, and that she continued to date Dustin even though she knew he had a criminal history. Amanda did not have a boyfriend at the time of trial.

Amanda started using drugs in 2005 or 2006 and continued using drugs for some time after K.R.B. was born. CPS removed K.R.B. from Amanda's care in May 2007 because she failed a hair follicle test. Thereafter, Amanda missed a number of visits with K.R.B. and did not comply with the child safety and evaluation plan that she had agreed to with Appellees because she was still using drugs.

There was extensive testimony detailing Amanda's criminal history. On or about January 11, 2008, Amanda pleaded guilty to the offense of possession of between four and two hundred grams of a controlled substance, namely methamphetamine, and the trial court placed her on ten years' deferred adjudication probation. Officer Charles Roberts testified about the circumstances surrounding Amanda's arrest, which occurred on December 26, 2006. According to Officer Roberts, he responded to a call that he described as a "check welfare

of a child that was inside of an apartment that was possibly cooking methamphetamine." As he approached the apartment, Officer Roberts met Joshua, who was coming out of the apartment. Joshua gave Officer Roberts permission to enter the apartment, but he yelled, "The police are here," when Officer Roberts entered the apartment. Officer Roberts observed Amanda, who was in a back bedroom, place something on the floor. In the bedroom, he discovered three baggies containing a substance that he believed to be methamphetamine—one on the floor where Amanda had placed something and two on the bed where Amanda had been seated. Officer Roberts also observed a purse on the bed and a methamphetamine pipe protruding from it. Amanda claimed to have owned the purse and the methamphetamine on the floor. Officer Roberts did not testify that he discovered an infant in the apartment.

On or about January 11, 2008, Amanda pleaded guilty to the offense of possession or transportation of certain chemicals (anhydrous ammonia) with intent to manufacture a controlled substance, namely methamphetamine. The trial court placed Amanda on ten years' deferred adjudication probation. The date of the offense was July 22, 2007. Also on or about January 11, 2008, Amanda pleaded guilty to the offense of possession or transportation of certain chemicals (pseudoephedrine) with intent to manufacture a controlled substance, namely methamphetamine. The date of the offense was also July 22, 2007, and the trial court placed Amanda on ten years' deferred adjudication probation. Officer Jeff Li testified that as he was responding to a call about a suspicious

vehicle parked near a residence, he observed the suspicious vehicle drive past him in the other direction. He initiated a traffic stop when he saw that the vehicle did not have any working taillights. The vehicle drove for about a block before pulling over. The driver of the vehicle, Dustin, exited the vehicle and fled on foot; Amanda was in the passenger seat. Officers discovered anhydrous ammonia, pseudoephedrine pills, and lithium strips—chemical precursors for manufacturing methamphetamine—in the vehicle. Amanda denied owning the vehicle, but a bill of sale found in the glove box was made out to her. Officers also discovered a switchblade in her purse and handcuffs, some ammunition, and a large dagger in the vehicle.

On or about January 24, 2008, Amanda pleaded guilty to the offense of prohibited substance in a correctional facility, and the trial court placed her on ten years' deferred adjudication probation. Deputy Donnie Cavinder testified that on December 10, 2007, he observed Amanda place a tobacco product in a dumpster near the jail. Amanda admitted that she had left the paraphernalia for Dustin and that she had done so on three or four other occasions. Amanda's mother drove Amanda to the dumpster to make the drop, but she was not charged with any offense.

In addition to the four felonies, Amanda testified that she had accumulated five misdemeanors, "quite a bit" for someone her age.

The trial court admitted MySpace and Facebook pages belonging to Amanda, Kenneth, Connie (Amanda's former best friend), and Dustin. The

15

exhibits contain a number of undated images of Amanda and others drinking and partying. Amanda testified that some of the images were from October 2008. An entry on Amanda's MySpace page states, "Amanda fucking rage last night omg we had a total blast doing it again today hell ya." Amanda admitted that one of her conditions of probation prohibited her from consuming alcohol.

Amanda stated that some of the individuals who were at the apartment where she was arrested on December 26, 2006, were drug users who had been involved in the criminal justice system. She admitted that K.R.B. had been around some of these people on a number of occasions. Amanda agreed that the lifestyle she was leading up until being placed on probation was not a lifestyle that a child should be subjected to and that it was dangerous for a child to be around people who used and manufactured drugs. She agreed that it was not in K.R.B.'s best interest when she used drugs after he was born.

Amanda did not deny that she had committed any of the criminal conduct detailed above, but she stated that she has changed her life. According to Amanda, she had not used illegal drugs since January 2008, when she was placed on probation. She submitted to hair follicle tests on August 28, 2008; December 11, 2008; February 25, 2009; and September 29, 2009; and each test result was negative. In March 2008, Amanda completed a twenty-eight day rehabilitation program at Serenity House in Abilene. She also completed parenting classes while at the program. Amanda stated that she progressed uninterrupted through the visitation schedule set out by the September 2008

16

temporary orders and that she had not missed a visit with K.R.B. since the orders were entered. Amanda testified that she had paid child support to Appellees for about a year[6] and that she had also complied with the temporary orders by not seeing Dustin.[7]

Amanda testified that she works at Michael's as a "front end supervisor." She has worked there since April 2008, and she works twenty-five hours per week but is hoping to begin working full time at some point. The department manager described Amanda as a "very hard worker," "very dependable," and "always on time." The manager testified that Amanda is around money all the time, that she trusts Amanda "more than anybody else," and that there had not been any openings for a full-time position since Amanda began working there.

Amanda testified that she agreed to let K.R.B. live with Appellees after CPS intervened because she knew that they could provide him with the care that he needed. But she explained that she had always wanted K.R.B. to be returned to her once she achieved her goals and that she felt like she deserved to have him back.[8]

Amanda stated that she could live with her mother as long as she needed and that her mother's house would provide a safe environment for K.R.B. She

---

[6]Amanda admitted owing Appellees $595 in child support.

[7]Amanda did post a comment on Dustin's MySpace page.

[8]Amanda agreed that Appellees should have some visitation with K.R.B.

described her relationship with K.R.B. as "great." Amanda testified that K.R.B. would "cling" to Laura when she dropped him off for visits but said that happened when he was not feeling well. Recently, when Laura drops off K.R.B., he "goes right to his room and we play." Amanda stated that she and K.R.B. play together and sing together and that K.R.B. opened up to her and calls her "mommy." At the time of trial, Amanda and Appellees were concluding weekend visits and were moving on to a standard visitation schedule.

### b.      Probation Officer

Traci Poore, Amanda's probation officer, testified that over the course of roughly the past twenty months before trial, Amanda had passed both of the urinalyses that she had been asked to take and that Amanda had reported to the probation office every month. Poore stated that she had visited Amanda's mother's and father's houses and that there had not been anything at either house that caused her concern. Poore also testified that in her visits with Amanda, she had never had any concern that Amanda was under the influence of drugs. Regarding the image on the MySpace or Facebook page of Amanda consuming alcohol, Poore testified that infraction alone would not cause Amanda's probation to be revoked.

### c.      Amanda's Mother

Terri G., Amanda's mother, testified that she had seen no signs that Amanda was using drugs again and that she had seen a "big change" in Amanda. She stated,

18

Q      Now, describe Amanda back when CPS first got involved. What kind of person was Amanda?

A      We didn't have much of a relationship. She was my daughter, but she was on drugs. She's made a lot of mistakes. She's paid for a lot of those mistakes, and she knows the mistakes that she's made.

       And she wants to live her life different now. She's - - I mean, back then we couldn't really talk. We didn't have much of a relationship. But right now, she's my best friend.

       . . . .

Q      Have you seen a big change in her life?

A      Oh, yeah. Yeah.

Q      What kind of changes have you seen in her life?

A      She's more focused on tomorrow. She's talked about going to school. She's thought - - you know, she's wanting to go on to school to get an education. To further her education.

       She's a more caring person. A whole lot more caring. She thinks about other people a lot of times more than she does herself.

Terri testified that Amanda could live with her "forever," that she did not allow people in and out of her house, and that she would not allow Amanda to bring someone to the house that could cause K.R.B. harm. She stated that K.R.B. was not in danger when he was at her house, that no one smokes in K.R.B.'s presence, that K.R.B. was watched closely while at the house, that it did not take time for K.R.B to adjust to being at the house when he would come over, and that overnight visits would be good for K.R.B.[9]

---

[9]Terri testified that she did not know what was happening when she drove Amanda to the jail and Amanda left tobacco for Dustin.

### d.     Amanda's Father

Like Terri, Barry G., Amanda's father, testified that he had seen a change in Amanda over the eighteen months before trial and that there had not been a point during that time that he thought Amanda was under the influence of drugs. Barry stated that Amanda was "herself again," that "she's got her life on track," and that he believed Amanda could be a good mother. Although he was not present when K.R.B. was dropped off or when K.R.B. left, Barry testified that he was often around when K.R.B. visited with Amanda, that Amanda took very good care of K.R.B., that he did not feel that K.R.B. was physically or emotionally harmed when he was with Amanda, and that Amanda would not do anything to harm K.R.B. Barry opined that K.R.B., whom he had formed a relationship with, would not have a problem with overnight visits and that he would adjust to them well.

### e.     Amanda's Sister

Brittany G., Amanda's sister, also testified that she had seen a "big change" in Amanda. She stated that she did not have a relationship with Amanda when K.R.B. went to live with Appellees because of Amanda's drug problem. Now, however, Amanda was the "big sister that [she] never had." Brittany could not recall any occasions lately in which she was around Amanda and felt like Amanda was using drugs. She testified that she did not think that Amanda would do anything to harm K.R.B. and that K.R.B. could begin overnight visitations with Amanda.

20

### f.    Laura

Laura testified that she and Hubert offered to help Amanda and Joshua with caring for K.R.B. when he was born.  Soon thereafter, Appellees watched K.R.B. every weekend and, eventually, more often than just during the weekend.  When K.R.B. was six months old, Appellees watched K.R.B. for two weeks after Amanda and Joshua had dropped him off with Laura's sister and proclaimed that they "need[ed] some time"; Laura suspected that Amanda and Joshua's lifestyle was getting out of control.  Laura opined that when CPS intervened in May 2007 (K.R.B. was eight months old), she and Hubert had cared for K.R.B. for approximately 120 days.

Appellees originally agreed with Amanda that they would care for K.R.B. while Amanda "[got] her act together," but they filed this suit after Amanda was arrested for smuggling tobacco into the jail.  Laura stated that she and Hubert had serious concerns for K.R.B.'s well-being after that incident, which they agreed was the "last straw."

Laura testified that she had concerns about K.R.B. being under Amanda's care.  One concern regarded Amanda's former drug use and the people that Amanda used to associate with, including the three men Amanda used to date—Joshua, Dustin, and Kenneth.  In light of the exhibits containing the MySpace and Facebook images, Laura stated that her greatest concern was if Amanda was continuing to associate with the same people she was around when she used illegal drugs.  Laura clarified in the following exchange with the trial court that she

21

did not think that K.R.B. was in any danger of physical harm or abuse from Amanda or her family; rather, she was worried about the people that Amanda chose to associate with:

> THE COURT: [Laura], I've got just maybe one or two questions. With regards to Mr. and Mrs. G[], the grandparents - -
>
> . . . .
>
> THE COURT: - - do you - - is it your opinion that the child is safe when he's in - - when he's visiting with them, with them present? Is he placed in harm's way in any way?
>
> [Laura]: I would hope not. I'd like to think not.
>
> THE COURT: Well, I'm - - I'm asking your opinion.
>
> [Laura]: In my opinion, the environments just are not conducive.
>
> THE COURT: Okay.
>
> [Laura]: They came into the picture when he was 10 months old.
>
> THE COURT: Well, I understand that. I'm asking: Is he in danger of any kind of physical harm or abuse - -
>
> [Laura]: From them? No. From the people that Amanda keeps, that's who we worry about. From her family, no.

Laura also expressed concern about disrupting K.R.B.'s stability. She testified that she and Hubert had raised K.R.B. for over two years, that K.R.B. had bonded with them, that K.R.B. was not ready for change, that K.R.B. was not ready for overnight visits, and that there was no need to "emotionally scar[]" him. Laura claimed that K.R.B. viewed Appellees as his parents and that his "stable atmosphere" was with them. In support of her claim that K.R.B. did not adjust

well to change, she testified that he had difficulty transitioning from one daycare class to another.

Laura further testified that she was concerned about dogs inside Amanda's house and smoke in the house before K.R.B. came over for visits. She also recounted that Amanda was unable on one occasion to administer K.R.B.'s allergy medicine.

### g. Hubert

Hubert's testimony mirrored Laura's testimony. He testified that considering Amanda's history, he had concerns about K.R.B.'s physical safety and emotional stability due to the people who K.R.B. might be around when he is with Amanda; that he did not think K.R.B. would be ready for overnight stays with Amanda until he is older; that K.R.B. had bonded with Laura; and that he was concerned about K.R.B.'s exposure to smoke at Amanda's house and Amanda's ability to administer K.R.B.'s allergy medicine.

### h. Appellees' Friend

Karen Albus, Appellees' friend, testified that K.R.B. had some difficulty interacting with strangers and that she had concerns about K.R.B.'s welfare in light of Amanda's past.

### 2. Insufficient Evidence to Overcome Parental Presumption

In *Lewelling*, the supreme court reversed the lower court's decision to appoint the paternal grandparents of the child managing conservators on the ground that naming the mother managing conservator would significantly impair

23

the child's physical health and emotional development. 796 S.W.2d at 165. Reasoning that a nonparent must "offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child," the court concluded that the following evidence was no evidence that appointing the mother as managing conservator would significantly impair the child's physical health or emotional development: (1) mother was unemployed at the time of the custody hearing; (2) mother lived in crowded conditions; (3) mother had twice been a patient at Terrell State Hospital; (4) mother's ex-husband had physically abused her, including when she was pregnant; (5) mother testified that she might consider reconciling with her ex-husband; (6) the child had resided most of his life with the grandparents; and (7) mother did not see the child for a two-month period at one point. *Id.* at 165–67, 172 (Gonzalez, J., dissenting).

In *In re S.W.H.*, this court reversed the trial court's judgment appointing nonparents sole managing conservators of the child on the basis of section 153.131 impairment grounds. 72 S.W.3d 772, 777–79 (Tex. App.—Fort Worth 2002, no pet.). Evidence that the mother (1) used to have a severe drug addiction, (2) was a recovering alcoholic and drug addict, (3) was incarcerated in a substance abuse treatment facility for twice testing positive for drug use in violation of her probation, and (4) had a live-in boyfriend at the time of trial who consumed alcohol outside the house was insufficient to support the trial court's challenged findings. *Id.* at 778–79. Regarding the evidence of the mother's drug

use, we stated that "none of this evidence regarding Appellant's actions more than four years ago demonstrates that appointing Appellant managing conservator *today* would significantly impair S.W.H.'s physical health or emotional development."[10] *Id.* at 778 (emphasis added).

In this case, Appellees' concerns about K.R.B.'s physical health and emotional development fall into four categories: (1) Amanda's past criminal conduct and drug use[11]; (2) the crowd that Amanda used to associate with[12]; (3) K.R.B.'s emotional attachment to Appellees and his difficulty adjusting to change[13]; and (4) issues regarding smoke at Amanda's house and her ability to administer K.R.B.'s allergy medicine. Although relevant, the evidence of Amanda's past criminal conduct and drug use does not demonstrate that appointing Amanda sole managing conservator at the time of trial would have significantly impaired K.R.B.'s physical health or emotional development. *See id.* (reasoning that evidence of mother's past severe drug addiction was not

---

[10]Other evidence in the sufficiency analysis included that the mother had managed to stay "clean" during the one and one-half years that she lived with the boyfriend up to the time of trial, that the child would be well cared for in the mother's current living situation, that a CPS caseworker did not have health or safety concerns for the child when the caseworker first intervened on behalf of the child, and that it was apparent that CPS intended the nonparents to return the child to the mother once she had completed treatment and corrected her problems. *S.W.H.*, 72 S.W.3d at 778–79.

[11]This includes the trial court's findings of fact 7(a), (b), (c), and (d).

[12]This includes the trial court's findings of fact 7(a), (b), and (d).

[13]This includes the trial court's findings of fact 7(d).

evidence that appointing her managing conservator would significantly impair child); *May*, 829 S.W.2d at 377 (reasoning that if the parent is presently a suitable person to have custody, that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling). The evidence shows that since being placed on probation roughly twenty months before trial, Amanda had passed multiple drug tests, had complied with her probation requirements, and had given no person who testified any indication that she had been under the influence of drugs. Amanda's testimony that she had not used drugs since being placed on probation was uncontroverted.

Appellees expressed strong concern for K.R.B. regarding the crowd that Amanda used to associate with. But there is no evidence that Amanda continued to associate with or was currently associating with Joshua or Dustin or anyone else who uses or used to use illegal drugs. Appellees' concerns that Amanda would resume associating with those persons once again at some point in the future are based on mere speculation and surmise, which is insufficient to support the trial court's finding. *See De La Pena*, 999 S.W.2d at 528 (reasoning that harm to the child may not be based on evidence that raises mere surmise or speculation of possible harm).

Appellees had concerns that K.R.B. would be emotionally harmed because he had lived much of his life with them, he had bonded with Laura, and he had difficulty adjusting to strangers. In *Lewelling*, the supreme court considered

26

evidence that the child had resided most of his life with the nonparents but concluded that the evidence was insufficient to demonstrate harm. *See Lewelling*, 796 S.W.2d at 167–69, 172 (Gonzalez, J., dissenting). We conclude similarly. Appellees also did not identify a specific, identifiable behavior or conduct of Amanda that caused or would probably cause harm to K.R.B.'s emotional development, nor did they present expert testimony that K.R.B.'s emotional development would be significantly impaired if Amanda is sole managing conservator. *See S.W.H.*, 72 S.W.3d at 778–79. That Appellees may be better parents than Amanda is insufficient to rebut the parental presumption. *See Lewelling*, 796 S.W.2d at 166.

Appellees' concerns about Amanda's administering medicine to K.R.B. and smoke in the house is some evidence of harm.

In *S.W.H.*, this court addressed the heavy burden that nonparents face in overcoming the parental presumption:

> It is an onerous burden to overcome the presumption that a child's natural parent should be appointed sole managing conservator absent some specific act or omission that demonstrates present parental unfitness. Although trial courts should be afforded broad discretion in deciding family law questions, the legislature has explicitly limited the exercise of that discretion when a nonparent seeks appointment as managing conservator.

*S.W.H.*, 72 S.W.3d at 779 (citations omitted). This case represents the type of "close call" that the supreme court addressed in *Lewelling*.

Accordingly, viewing the entire record under the legal and factual sufficiency standards of review articulated above, we conclude that, while there is

some evidence that placing K.R.B. under the sole managing conservatorship of Amanda might significantly impair K.R.B.'s physical health and emotional development, the evidence is factually insufficient to support a finding of such impairment. We therefore hold that the trial court abused its discretion by so finding. We sustain this part of Amanda's second issue.

Having sustained Amanda's evidentiary sufficiency challenge to the trial court's seventh finding of fact, we do not address her challenge to the part of the trial court's fifth finding of fact that appointing her as a managing conservator with the exclusive right to designate K.R.B.'s primary residence would significantly impair K.R.B.'s physical health or emotional development. *See* Tex. R. App. P. 47.1; *see also Critz*, 297 S.W.3d at 472 (reasoning that section 153.131 "contains no language that indicates a legislative intent that a parental presumption applies to the issue of primary custody *apart from* the determination of joint managing conservatorship"; section 153.131 "makes no reference to a separate presumption for determining which joint managing conservator chooses the child's permanent residence").

28

## IV. CONCLUSION

Having sustained part of Amanda's second issue, we reverse the trial court's order and remand the case to the trial court for a new trial.

BILL MEIER
JUSTICE

PANEL:  WALKER, MCCOY, and MEIER, JJ.

DELIVERED:  October 7, 2010

29